**COUNTY OF OAKLAND,**
**Plaintiff-Appellee,**

v.

**CITY OF BERKLEY, et al., Defendants,**

**City of Madison Heights,**
**Defendant-Appellant.**

No. 83–1173.

United States Court of Appeals,
Sixth Circuit.

Argued April 5, 1984.

Decided Aug. 24, 1984.

Bernard Friedman, Southfield, Mich., for defendant-appellant.

William P. Hampton (argued), Davidson, Gotshall, Kohl, Secrest, John M. Donohue, Farmington Hills, Mich., for plaintiff-appellee.

Before LIVELY, Chief Judge, WELL-FORD, Circuit Judge, and GIBSON, District Judge.[*]

LIVELY, Chief Judge.

This appeal presents questions of subject matter jurisdiction and the propriety of summary judgment. Both questions are affected by the nature of existing litigation with which this case was consolidated by the district court.

## I.

### A.

In 1977 the United States, at the request of the Environmental Protection Agency, initiated a compliance action in the district court against the City of Detroit, the Detroit Water and Sewerage Department and

---

[*] The Honorable Benjamin F. Gibson, Judge, United States District Court for the Western District of Michigan, sitting by designation.

the State of Michigan. This action, No. 7–71100 on the docket of the district court, charged the defendants with violation of the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251 et seq. (1976), by the discharge of effluents and pollutants from wastewater and sewage facilities into navigable waters. See generally *United States v. City of Detroit*, 720 F.2d 443, 445 (6th Cir.1983). The plaintiff in the present case, Oakland County, Michigan, was permitted to intervene in No. 7–71100 and thereafter the district court entered an order pursuant to Rule 19(a), Fed.R.Civ.P., adding all municipalities and agencies under contract with the City of Detroit for sewage services as parties to that action. The defendant in the present case, City of Madison Heights, was added as a party pursuant to this order. In September 1977 the district court entered a consent judgment in No. 7–71100, binding on all parties thereto and their successors. The consent judgment established a compliance schedule for achieving secondary treatment of pollution sources in the shortest reasonable time.

The connection between Oakland County, the City of Madison Heights and Detroit's pollution problems arose from long-standing agreements under which Detroit has received and disposed of sanitary and storm sewage originating in nearby communities. In 1942 several municipalities joined together to create the Southeastern Oakland County Sewage Disposal System (Southeastern System) pursuant to a Michigan enabling act. The Oakland County Drain Commissioner was made agent for the contracting parties. In 1962, in contemplation of the construction of extensive facilities and in anticipation of a contract with the City of Detroit for disposition of sewage from the Southeastern System, the participating communities, including Madison Heights, entered into a written agreement with Oakland County. The contract, dated October 1, 1962, apportioned the cost of the improvements among the municipalities within the Southeastern System, allocating slightly more than ten percent of the project cost to Madison Heights. To pay for the construction Oakland County agreed to issue bonds and each municipality agreed to raise funds sufficient to pay the principal and interest representing its allocated share of the costs, and each pledged its full faith and credit for the prompt payment of their charges.

The 1962 contract also contained an agreement for defraying the costs of operating the project. Paragraph 13 provided in part:

> The municipalities agree to pay the county for the disposal of storm and/or sanitary sewage at such rates as shall be fixed from time to time in accordance with the provisions of this agreement and Act No. 342, Michigan Public Acts of 1939, as amended. Such charges shall be sufficient to provide:
>
> (a) for all costs of operating and maintaining said county sewage disposal system including charges by Detroit for sewage disposal;
>
> (b) for the maintenance of the $125,000 Reserve in the Operation and Maintenance Fund and the $25,000 Replacement Fund, at the said amounts, after their original establishment as provided in paragraph 15 hereof;
>
> (c) for any other necessary and proper costs and expenses relating to the system.

Paragraph 14 provided that "[s]ervice charges by the county for the disposal of *sanitary* sewage shall be made to each municipality upon the basis of the amount of water consumed therein," subject to exceptions not here applicable where metering was not available, and that "[i]n those cases where a municipality, *in whole or in part*, is served by combined storm and sanitary sewers, an extra charge shall be made against such municipality to cover the cost of the disposal of *storm* water." (Emphasis added). In November 1962 Oakland County entered into a contract with the City of Detroit by which Detroit agreed to receive and dispose of sanitary and storm sewage from the Southeastern System and the County agreed to a schedule of

payments for this service. Oakland County served as an intermediary only, depending completely on payments from the municipalities to meet its obligation to Detroit.

**B.**

In 1970 Oakland County and the municipalities determined that it was necessary to "extend, improve and enlarge" the sewage system operated by the Southeastern System to abate pollution in the Red Run Drain and Clinton River. This decision necessitated the acquisition and construction of a "pollution control facility." The project involved the construction of an enclosed retention chamber in the Red Run Drain right-of-way which previously had been an open drain. A written contract was executed by Oakland County and the municipalities including Madison Heights, dated April 1, 1970. In this contract the parties approved the project and the purchase of additional flowage rights from the City of Detroit. The municipalities agreed to pay the net cost of the project, with the share of each allocated according to a schedule included in the agreement. Madison Heights was required to pay approximately seven percent of the cost of the project rather than the ten plus percent allocated to it under the 1962 contract. The 1970 contract contained no new agreement with respect to service charges, but adopted and specifically incorporated portions of the 1962 contract, including paragraphs 13 and 14.

**II.**

**A.**

The action by the United States against the City of Detroit (No. 7–71100) was a wide-ranging suit which charged Detroit with all manner of pollution. Some 18 months after entry of the consent judgment in that case the district court found that Detroit was far from being in compliance with the requirements of the judgment. The court determined that the appointment of an "administrator of operations" for the City of Detroit Wastewater Treatment Plant was necessary. The court appointed the mayor of Detroit as administrator "empowered to exercise extraordinary remedies in the control, management and operation" of the plant. *United States v. City of Detroit,* 476 F.Supp. 512, 515 (E.D.Mich.1979). The appointment was based on the "broad range of equitable powers available to this court to enforce and effectuate its orders and judgments." *Id.* at 520 (citations omitted). The administrator was granted "such powers as are traditionally exercised by receivers to manage and conduct such operations under the supervision of the court." *Id.* at 521. There is no issue in this case with respect to the validity of the appointment or the powers of the court-appointed administrator or receiver.

An additional order was entered in No. 7–71100 in October 1979 which provided in part:

> All customers, users or rate payers of the City of Detroit Wastewater Treatment System shall refrain from any and all litigation before any other court based upon the subject rate structure.

This order has not been challenged in these proceedings. Oakland County was a customer, user and rate payer of the Detroit System and both Oakland County and Madison Heights were parties to No. 7–71100.

**B.**

In December 1980 the Oakland County Drain Commissioner adopted a new formula for calculating the quantity of storm water runoff which should be charged to each municipality within the Southeastern System. This action was taken because the previous practice of estimating runoff on the basis of water consumption was inaccurate. The new method, sometimes called the "rational formula," was based on a standard engineering equation, $Q = CIA$ ($Q$ equals storm water flow; $C$ equals runoff coefficient; $I$ equals ten-year average rainfall and $A$ equals area). The adoption of the new formula resulted in an increase in the monthly services charges for storm water disposal allocated to Madison Heights. The total increase did not appear on the

billings to Madison Heights until June 1981 because the drain commissioner failed to include a 960-acre tract in Madison Heights in the area calculations for the first six months.

Prior to the construction of the 1970 pollution control facility surface water from the 960-acre tract had flowed directly into the open Red Run Drain and was not included in the sewage transmitted to Detroit for disposal. With the construction of the enclosed retention chamber in the Red Run Drain the storm water from the 960-acre tract was fed into the new chamber and became part of the total sewage which wound up in the Detroit system. Madison Heights took the position that it never had paid service charges for the storm water from the 960 acres and that it was not required to pay merely because the Southeastern System had adopted a new formula.

### III.

#### A.

When Madison Heights persisted in its refusal to pay the service charges Oakland County filed the present action seeking a declaratory judgment that Madison Heights is required to pay the "storm water disposal charges allocated to the 960 acres in Madison Heights which formerly discharged storm water through a system of separated storm sewers into the open Red Run Drain." The district court immediately consolidated the present case with No. 7–71100. In its answer Madison Heights denied that the district court had jurisdiction, alleged that it had not paid service charges for storm water from the 960-acre tract since completion of the pollution control facility and that the "then Drain Commissioner ... agreed to and did eliminate from any assessment of costs of contribution and future storm water charges said 960 acres." The reason for this agreement, as alleged in the answer, was the fact that prior to construction of the pollution control facility the storm sewers serving the 960 acres were separated from the sanitary sewers. By an amended answer Madison Heights pled that the county was estopped from making service charges based on storm water disposal from the 960 acres because of the alleged agreement of the drain commissioner, Madison Heights' reliance thereon and the failure to bill for such charges prior to June 1981.

Oakland County filed a motion for summary judgment supported by copies of the October 1, 1962 contract, the subsequent agreement between the Southeastern System and the City of Detroit and the affidavit of the current drain commissioner. After referring to the language of the 1962 agreement which provided that where a municipality is served, in whole or in part, by combined storm and sanitary sewers an extra charge shall be made for costs of disposing of storm water, the affidavit stated:

> The City of Madison Heights, in part, is served by a combined storm and sanitary sewer system which delivers sewage to the Southeastern Oakland County Sewage Disposal District, which in turn delivers the sewage flow from the City of Madison Heights to the City of Detroit for treatment and disposal.

The affidavit also traced the change from charging for storm water on the basis of inadequate estimates to adoption of the rational formula. Under the old method, according to the affidavit, the estimated volume of storm water from Madison Heights included the 960-acre tract after completion of the pollution control facility in 1973. The increased charges after December 1980 were based on the more accurate formula, not on the addition of an area that had not been included in the calculations under the old method. The affiant stated that he had been unable to find any agreement by a prior drain commissioner exempting the 960-acre tract from service charges for storm water and that he had made no such agreement or representation during his term of office.

Madison Heights filed "objections" to the motion for summary judgment supported by four affidavits. The affidavit of the

former city engineer and city manager of Madison Heights stated that it was agreed at the time of the construction of the enclosure in the Red Run Drain that "the City of Madison Heights was not to be required to pay for the storm water which flowed from an area in proximity to the Red Run Drain for which there were separate sewerage outlets and which consisted of an area of approximately one thousand (1,000) acres." Another affidavit by the project engineer for the pollution control facility project stated that the affiant had personal knowledge of written documentation establishing an agreement that Madison Heights was to receive special consideration for storm waters from the area which ran into the open Red Run Drain, and that based on this agreement Madison Heights was not to be billed for these storm waters. This affiant further stated that in return for this special consideration Madison Heights gave up its right to have an enclosed storm water drain constructed alongside the enclosure of the pollution control facility to extend beyond that enclosure and take its storm water downstream rather than emptying it into Detroit's disposal system.

Daniel Barry who had been Oakland County Drain Commissioner from 1957 through 1971 filed two affidavits. In the first affidavit Barry stated that Madison Heights received special consideration in a reduction of the capitalization costs of the enclosed pollution control facility and that in lieu of having a separate enclosed drain built alongside the enclosed facility "it was agreed and understood that the City of Madison Heights would not be charged for storm waters which formerly went into the open Red Run Drain." In his second affidavit Barry stated that the 960-acre tract was part of the Red Run Drain, that the pollution control facility involved combined sanitary sewer and storm waters from the "Twelve Towns" and that the Oakland County Drain Commissioner did not have jurisdiction over the 960 acres. This last claim appears to have been abandoned by Madison Heights.

No written documentation was filed with the affidavits and the district judge found the affidavits "deliciously vague." The court ordered a hearing at which it would receive testimony to test the affidavits. At the several hearings which followed it became clear that none of the agreements referred to in the affidavits filed by Madison Heights was in writing. No witness produced or claimed to know of a writing which modified the provisions of paragraphs 13 and 14 of the October 1, 1962 contract. It was clear that Madison Heights had been required to bear a smaller share of the cost of the 1970 construction of the enclosed pollution control facility than it had borne of the facilities constructed pursuant to the 1962 agreement. Oakland County did not dispute that this reduction was made in recognition of the fact that Madison Heights had previously discharged separated storm water from the area adjacent to the Red Run Drain, including the 960-acre tract, directly into the open drain. However, this concession in the 1970 agreement related to capital construction costs only. There was no parallel provision in the 1970 agreement relieving Madison Heights of future service charges for disposal of the storm water. Rather, the 1970 agreement specifically incorporated the service charge provisions contained in the 1962 contract.

### B.

The district court granted summary judgment in favor of Oakland County after first finding that it had pendent jurisdiction over the action. In holding that Madison Heights had failed to demonstrate the existence of a genuine issue as to any material fact the district court reviewed the record, including the testimony taken at the hearings. The court concluded that Madison Heights was relying on an oral agreement and that such an agreement would be unenforceable under the Michigan statute of frauds, Mich.Comp.Laws Ann. § 566.132 (West Supp.1984). The court pointed out that the 1962 and 1970 contracts ran until the year 2002, and obviously the agreement relied upon by Madison Heights could not be performed within

one year. The court further found that the alleged agreement was not taken out of the statute of frauds by reason of part performance and that Madison Heights' affirmative claim of estoppel had not been established. On the basis of the entire record the district court concluded that Oakland County was entitled to judgment as a matter of law. Rule 56(c), Fed.R. Civ.P.

## IV.

Madison Heights raises two issues on appeal: the district court's jurisdiction and Oakland County's right to summary judgment.

## A.

■ Madison Heights makes two distinct arguments concerning jurisdiction. In the first place, it contends that this action presented the single issue of rights under a contract between political subdivisions of the State of Michigan and that the district court's decision stretches the scope of pendent jurisdiction "beyond the wildest imagination and intent" of the Supreme Court. The second argument is that the dispute should have been submitted to Oakland County's Board of Review pursuant to Mich.Comp.Laws Ann. § 46.176 (1967). The second argument was the only one made to the district court and it was answered in the district court's unpublished opinion accompanying its summary judgment order. Briefly, M.C.L.A. § 46.176 provides for review by a county board of review "[a]t the request of any unit of government ... charged for services ...." Madison Heights never requested review and the party which did request review in the district court was the charging, not the charged, party. The short answer to this argument is that Madison Heights did not take the steps required to bring its dispute with the drain commissioner before the board of review.

■ The argument raised for the first time in this court with respect to pendent jurisdiction is more substantial and requires our careful consideration. The issue of subject matter jurisdiction is always before a federal court and Madison Heights did not waive its right to contest the finding of pendent jurisdiction by failing to address it in the district court. *Detroit, Toledo & Ironton R.R. v. Consolidated Rail Corp.*, 727 F.2d 1391, 1393 (6th Cir. 1984).

## B.

Oakland County's complaint sought a declaratory judgment to settle a dispute between two political subdivisions of the State of Michigan arising out of a series of contracts. There was no independent basis of federal jurisdiction over this action; it dealt with a question controlled by state law and there was no diversity of citizenship between the parties. The district court found that it was substantially related to No. 7–71100 and that it was properly consolidated with that case and considered under principles of pendent jurisdiction.

Pendent jurisdiction is most frequently asserted when a plaintiff joins state-law claims with federal claims in a single action. The Supreme Court set forth the basic requirements for the exercise of pendent jurisdiction in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Court treated the subject further in later cases, notably, *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), and *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). *Gibbs* formulated the test for determining whether there is a constitutional impediment to a federal court's considering a pendent state claim:

> The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

383 U.S. at 725, 86 S.Ct. at 1138 (footnote omitted). *Gibbs* also dealt with the discretion of district courts to exercise pendent jurisdiction or decline it once the power to do so is established. *Aldinger* and *Owen Equipment* articulated policy considerations based on the particular statute which confers jurisdiction over the primary federal claim. See also *Melamed v. Lake County National Bank,* 727 F.2d 1399, 1403 (6th Cir.1984).

■ Looking first to the power of the district court to exercise jurisdiction over this case, our inquiry is whether this action and No. 7–71100 "derive from a common nucleus of operative fact." We conclude that they do. The City of Detroit was in violation of the Water Pollution Control Act and the jurisdiction of the district court had been invoked under that statute. Part of Detroit's problem arose from the fact that it acted for many of its neighbors in disposing of their sewage. When the district court appointed an administrator with broad powers to bring Detroit into compliance, it was essential that some control be asserted over all agencies whose activities contributed to the pollution problem. The "common nucleus" was the Detroit water pollution problem. This problem, to which many entities contributed, was properly before the district court in No. 7–71100. The present dispute was so intertwined with the solution to the common issue of pollution that we have no doubt the court had the power to assert jurisdiction.

■ Nor do we find an abuse of discretion in the district court's retaining jurisdiction over the present case. Since Oakland County is a mere conduit for sewer charges owed to the City of Detroit the failure of any of the municipalities in the Southeastern System to pay the charges allocated to them would result in Detroit's receiving less money for sewage disposal than was assumed and planned for in the consent judgment. The collection of service charges from all its customers, users and rate payers was essential to Detroit's compliance with the terms of the consent judgment. Consolidating the present action

with No. 7–71100 enabled the district court to enforce and effectuate the terms of the consent judgment.

Turning finally to the matter of "policy considerations," there is nothing in the Water Pollution Control Act which would militate against the joinder. In addition, considerations of judicial economy and efficiency clearly support the district court's decision to proceed with the present case.

■ It may be that the district court exercised ancillary rather than strict pendent jurisdiction in this case. In some cases there is no difference between the two and they are treated as "two species of the same generic problem." *Owen Equipment,* 437 U.S. at 370, 98 S.Ct. at 2401. However, pendent jurisdiction usually applies when a plaintiff seeks to join a state claim with a federal one in the federal forum which he has chosen, while "ancillary jurisdiction typically involves claims by a defending party haled into court against his will, or by another person whose rights might be irretrievably lost unless he could assert them in an ongoing action in a federal court." *Id.* at 376, 98 S.Ct. at 2404 (footnote omitted).

It appears that the present case does not fit precisely either definition. This may be a case which supports the argument that the labels of pendent and ancillary jurisdiction should be abandoned in favor of the concept of "incidental jurisdiction." See Note, *A Closer Look at Pendent and Ancillary Jurisdiction: Toward a Theory of Incidental Jurisdiction,* 95 Harv.L.Rev. 1935 (1982). Laying aside this interesting exercise in semantics, we have found the Note helpful in analyzing the present case.

#### C.

Our conclusion is that there is a variety of ancillary jurisdiction which fits the instant case. Oakland County was allowed to intervene and Madison Heights was joined in No. 7–71100 before they had any dispute with each other. This intervention and joinder occurred because the district court had assumed control in that case over

all the operations of the Detroit Wastewater Treatment Plant. The Supreme Court noted in *Owen Equipment* that ancillary jurisdiction of federal courts originally flowed from cases which held that when federal jurisdiction "effectively controls the property or fund under dispute, other claimants thereto should be allowed to intervene in order to protect their interests, without regard to jurisdiction." 437 U.S. at 375 n. 18, 98 S.Ct. at 2403 n. 18, quoting *Aldinger v. Howard*, 427 U.S. at 11, 96 S.Ct. at 2419. *Owen Equipment* also affirmed that "in determining whether jurisdiction over a nonfederal claim exists, the context in which the nonfederal claim is asserted is crucial." 437 U.S. at 375–76, 98 S.Ct. at 2403–04 (citation omitted). When viewed in context the dispute between Oakland County and Madison Heights affected the district court's ongoing efforts to bring the Detroit Wastewater Treatment System into compliance with statutory requirements and the terms of the consent judgment. Though the Court in *Owen Equipment* found no pendent or ancillary jurisdiction in that case it recognized that "Congress did not intend to confine the jurisdiction of federal courts so inflexibly that they are unable to protect legal rights or effectively to resolve an entire, logically entwined lawsuit." *Id.* at 377, 98 S.Ct. at 2404. The present case involved the district court's effort to resolve "an entire, logically entwined lawsuit" effectively and its retention of the case as ancillary to No. 7–71100 provided "a common-sense solution to the problems of piecemeal litigation that otherwise would arise by virtue of the limited jurisdiction of the federal courts prescribed in Article III and the complexity of many modern lawsuits." 13 C. Wright & A. Miller, *Federal Practice and Procedure* § 3525 (1975) quoted in *New York State Association for Retarded Children, Inc. v. Carey*, 438 F.Supp. 440, 446 n. 6 (E.D.N.Y. 1977).

## V.

The remaining question is whether the district court properly granted summary judgment. Madison Heights presents two related arguments. It contends that the district court was required to resolve issues of fact before granting summary judgment, and that the court required it as the non-moving party to establish certain facts, both improper summary judgment procedures.

### A.

■ The most basic rule of summary judgment practice is that judgment may not be granted if there is a genuine issue with respect to any material fact. The first factual issue which Madison Heights attempted to raise in its counter affidavits related to the existence of an agreement exempting it from payment of service charges on storm water from the 960-acre tract. The affidavits referred to such an agreement, but no supporting documents were filed. There can be no question that the existence of an agreement containing an exception to the requirements of the contract relied upon by Oakland County would be a material fact in this case if the agreement were enforceable. The district court concluded that it needed to know more about this alleged agreement and ordered an evidentiary hearing.

■ After hearing the testimony the district judge said he did not believe such an agreement had been made. That was a finding with respect to a disputed fact, and if it had been the only basis for his decision, we would be required to reverse and remand for a full hearing. However, Judge Feikens went further and found that if such an agreement had been made it was not in writing, and therefore was barred under the Michigan statute of frauds. There was no evidence of any writing which would take the alleged agreement out of the statute of frauds. Since Madison Heights had raised the issue of an exempting agreement the district court was permitted to test affidavits by requiring a further showing that a genuine issue existed. This procedure is within the scope of Rule 56(e) which places the burden on the non-moving party to show by specific

facts that there is a genuine issue for trial where the moving party has supported its motion by affidavits and supporting documents. It should be noted as well that Rule 43(e), Fed.R.Civ.P., authorizes district courts to take testimony on motions.

■ Madison Heights also argues that the district court resolved a disputed issue of fact in finding that the 960-acre parcel has combined sewers for purposes of paragraph 14 of the 1962 contract. The district court based its statement on an admission by Madison Heights at argument that all storm water eventually mixes with sanitary sewage. However, the question of whether the 960-acre tract has combined or separated sewers was not the issue. Paragraph 14 of the 1962 agreement provided for an extra charge "in those cases where a municipality, *in whole or in part,* is served by combined storm and sanitary sewers...." (Emphasis added). Madison Heights made no attempt to raise as an issue of fact a claim that no part of its entire area was served by combined sewers. The district court, responding to Madison Heights' argument that the 960-acre tract was served by separated sewers, stated:

> However, part of Madison Heights is served by combined sewers. This makes it appropriate to charge for all Madison Heights storm water.

The fact that the 960-acre tract may have had separated storm and sanitary sewers was irrelevant.

### B.

■ The function of summary judgment is to avoid a useless trial. While the trial court must treat papers in opposition to summary judgment indulgently, *Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425, 427 (6th Cir.1962), it is not required to overlook the truism that every alleged dispute of fact does not relate to material fact and thus may not raise a genuine issue requiring a trial. Madison Heights filed no documents with its affidavits in support of the assertion that an agreement existed which exempted it from the payment of service charges prescribed in the 1962 contract. Since these payments were required by a written contract with 13 signatories, prudence dictated that the court investigate further if a useless trial was to be avoided. By further investigation Judge Feikens learned that the basis of Madison Heights' claim in the case did not raise a genuine issue of material fact. The only agreement which Madison Heights relied on to escape the obligations of the 1962 contract was unenforceable. Therefore, its affidavits and the supporting testimony detracted in no way from the conclusion that Oakland County was entitled to judgment as a matter of law.

■ Speaking from the bench the district judge stated that he did not believe the oral agreement relied upon by Madison Heights existed. Such a finding was not necessary to the ultimate conclusion, however, and in his oral statement the judge also held that even if established, the oral agreement was not enforceable because it did not satisfy the requirements of the Michigan statute of frauds. In his written opinion the district court relied upon the statute of frauds only in holding that Oakland County was entitled to summary judgment. This court can affirm summary judgment on any basis supported by the record, ignoring, if necessary an erroneous basis relied upon by a district court. *Herm v. Stafford,* 663 F.2d 669, 684 (6th Cir. 1981). Here the district court actually relied on its conclusion that an oral agreement even if it existed, would not affect Madison Heights' obligation to pay storm water charges under the 1962 contract. This conclusion is fully supported by the record, and Madison Heights has not argued that the statute of frauds ruling by the district court was erroneous.

■ The argument that Oakland County was estopped to make charges for storm water from the 960-acre parcel has no merit. In 1970 Madison Heights gave up its right to have a separate drain for the formerly separated storm water from the 960-acre tract. It now claims to have done so in reliance on an agreement by Oakland

County never to charge it for storm water flow from the 960-acre tract. However, from the record it is clear that this "change of position" was based on a reduction in its share of the construction costs of the pollution control facility as reflected in the 1970 agreement. There was no showing that exemption from the payment of future service charges was ever a consideration. The necessary elements of estoppel are not present.

The judgment of the district court is affirmed.

Merritt, Circuit Judge, dissented and filed opinion.