The UNITED STATES of America,
Plaintiff, and Counter-Defendant,

v.

The WAYNE COUNTY DEPARTMENT
OF HEALTH–AIR POLLUTION
CONTROL DIVISION, Plaintiff,

v.

The STATE OF MICHIGAN, Defendant,
Counter-Plaintiff, and Cross-Plaintiff,

v.

The CITY OF DETROIT, a municipal
corporation, and The Detroit Water
and Sewerage Department, Defendants,
and Cross-Defendants,

v.

ALL COMMUNITIES AND AGENCIES
UNDER CONTRACT WITH the CITY
OF DETROIT FOR SEWAGE TREAT-
MENT SERVICES, et al.

Civ. A. Nos. 77–71100, 80–71613.

United States District Court,
E.D. Michigan, S.D.

Dec. 11, 1984.

See also D.C., 571 F.Supp. 90.

David Taliaferro, Asst. Regional Counsel, U.S. Environmental Protection Agency, Region V, Chicago, Ill., L. Michael Wicks, Asst. U.S. Atty., Detroit, Mich., for U.S. EPA.

Richard J. McClear, Dykema, Gossett, Spencer, Goodnow & Trigg, Lynn Ferris, Asst. Corp. Counsel, City of Detroit Law Dept., Detroit, Mich., for City of Detroit.

Philip G. Tannian, Nederlander, Dodge & McCauley, Detroit, Mich., for Greater Detroit Chamber of Commerce.

John E. Breen, Wayne County Bd. of Public Works, Detroit, Mich., for Wayne County Bd. of Public Works.

Joseph B. Klein, Asst. Wayne County Pros. Atty., Detroit, Mich., for Wayne County Air Pollution Control Div.

James A. Smith, Bodman, Longley & Dahling, Detroit, Mich., for Macomb County.

Thomas F. Schimpf, Asst. Atty. Gen., Lansing, Mich., for Michigan DNR.

John P. Williams, Butzel, Long, Gust, Klein & VanZile, Detroit, Mich., for Food and Allied Industries Committee of Metro Detroit.

## MEMORANDUM OPINION AND ORDER

FEIKENS, Chief Judge.

Plaintiff, Macomb County,[1] is one of the communities and agencies under contract with the City of Detroit for water and sewerage treatment services. On August 8, 1983, plaintiff filed a complaint for rate relief against the Detroit Water and Sewerage Department (DWSD) challenging the Fiscal Year (FY) 1984 rates. On September 11, 1984, plaintiff filed a motion for partial summary judgment on three of the claims raised in its complaint. First, plaintiff asserts that its FY 1984 rates improperly included the construction costs for certain capital projects which were not begun in that fiscal year. Second, plaintiff asserts that DWSD wrongfully failed to distribute to plaintiff its share of a $1 million grant from the Michigan Legislature to help pay for restoration of the Edison Corridor section. Finally, plaintiff argues that the Environmental Protection Agency (EPA) has improperly asserted, and DWSD has agreed to, a set-off of more than $700,-

---

1. This action was originally filed by the United States Environmental Protection Agency against the City of Detroit. For purposes of this opinion, Macomb County will be designated "plaintiff" since it seeks rate relief from the Detroit Water and Sewerage Department. This practice is consistent with other opinions issued in this case under principles of ancillary and pendent jurisdiction.

000 against the grant funding of the permanent repairs to the Hayes/15 Mile Road interceptor. Plaintiff asserts that each of these errors has increased its rates. I will consider each claim in turn.

## I. CAPITAL PROJECTS COMPONENT OF FY 1984 RATES

Plaintiff's FY 1984 sewerage treatment rates increased approximately 17 percent over FY 1983 rates. This increase was largely due to inclusion of certain costs for capital projects allocated to Macomb County. Contrary to the projections on which FY 1984 rates were based, four of the five capital projects for which costs were allocated to plaintiff had not been started during FY 1984 (June 30, 1984). Since the 1978 Settlement Agreement provides that rates shall be based on estimated costs during the period for which the rates are established, allocation of these capital costs to plaintiff's FY 1984 rates resulted in an overpayment of nearly $2.5 million. Plaintiff seeks an immediate refund of this overpayment, plus interest.

Plaintiff argues that when the Board of Water Commissioners adopted the FY 1984 rates in January, 1983, DWSD knew that four of the five planned capital projects would not be started by the end of FY 1984. To support this argument, plaintiff relies heavily on several "project narratives." These narratives were written on November 30, 1982, and describe briefly the various capital projects. There are handwritten notes on the narratives which indicate that, as of January 7, 1983, four of the projects had not yet been started. Plaintiff also cites to DWSD's computer rate model analysis, run in mid-FY 1984, which indicates that no money was expended on four of the planned projects. From these documents, plaintiff concludes, presumably, that DWSD acted unreasonably in including the projected capital costs in

its FY 1984 rates, and therefore, plaintiff claims it is entitled to an immediate refund.

DWSD admits that four of the planned capital projects were not started in FY 1984 and that, as a result, plaintiff's rates included a significant overcharge. DWSD disputes, however, that plaintiff is entitled to an *immediate* refund, with interest, of this overcharge. DWSD argues that it had not decided to postpone the capital projects beyond FY 1984 when it set that year's rates and therefore, it acted reasonably when it set those rates. Further, DWSD argues that any refund to which plaintiff is entitled should be handled through the "look-back" procedure which reconciles what actually happened in a given fiscal year with the estimates on which that year's rates are based.

Due to both legal and contractual obligations, DWSD developed FY 1984 rates in November, 1982,[2] some 20 months prior to the end of FY 1984. These rates, therefore, are based on a variety of projections and estimates of future events. In determining capital costs, DWSD must estimate, among other things, the final cost of the project, its starting date, federal and state funding requirements, principal and interest payable on revenue bonds, and the timing and quantity of bond sales. *See* Declaration of William Carney. Needless to say, these projections are very difficult to make with precision.

Allocating costs among users of the system, moreover, is a very complex procedure. DWSD uses a rate model in which the various users' rates are interrelated. Retroactively modifying the rates of one user would require adjusting the entire system and modifying the rates of many, if not all, ratepayers. This sort of rate modification would impose a significant administrative burden on DWSD.

In this case, I find that plaintiff has failed to present sufficient evidence to

---

2. Although the FY 1984 rates were developed in November, 1982, they were adopted in January, 1983. In analyzing whether DWSD acted reasonably when it set these rates, plaintiff focuses on the time the rates were adopted rather than

the time they were developed. I need not decide which is the critical date since even if I focus on the latter date, the evidence before me does not compel the conclusion which plaintiff urges.

justify imposing such a burden on DWSD. First, plaintiff relies on the January 7, 1983, notes written on the project narratives. These notes, according to plaintiff, indicate that DWSD had decided not to start the capital projects during FY 1984 when it set that year's rates. DWSD, however, claims that these notes meant only that, as of January 7, 1983, these projects had *not yet* been started. The notes were written by George Haberer, Senior Associate Civil Engineer, who stated that he "was neither informed, nor did [he] intend to indicate to Macomb County in January of 1983 that the Department had made a decision not to start the [projects]." *See* Declaration of George Haberer. Since plaintiff has moved for summary judgment, it must establish that the facts on which it relies are not in dispute. *See County of Oakland v. City of Berkley*, 742 F.2d 289, 297 (6th Cir.1984); *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir.1979), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). Since the parties disagree about the inferences to be drawn from these notes, I am unable to grant summary judgment based on this evidence.

Second, plaintiff points out that DWSD recognized when it was setting FY 1985 rates in December, 1983, that the capital projects would be delayed past the end of FY 1984. Plaintiff concludes from this evidence that when DWSD set FY 1984 rates in November, 1982, it knew that the capital projects would not be started in FY 1984. I find this logic uncompelling. I find no reasonable support for plaintiff's claim that what DWSD knew in December, 1983, it also knew approximately a year earlier. Accordingly, I must deny plaintiff's requested relief.

This is not to say, however, that plaintiff is unable to receive credit for its overpayment. The "look-back" mechanism incorporated into the rate model will ensure that plaintiff receives any credit to which it is entitled. The rate structure is very intricate and complex, and it would be virtually impossible to re-run rate calculations every time one of the assumptions on which the rates are based proves, with hindsight, to have been inaccurate. The "look-back," therefore, provides a practical solution to the problems necessarily created by establishing rates based on predictions of the future. I see no reason not to allow the "look-back" analysis to perform its intended purpose.

■ I further refuse to require DWSD to pay interest on the over-charge it collected from plaintiff. There is no agreement between the parties providing for interest to be paid on overcharges or undercharges, nor is there a history of so doing.

Finally, in both its request for immediate return of its overpayment and for interest on that overpayment, plaintiff asks to be singled out for special consideration. Adjustments to all other DWSD customers' rates are handled through the "look-back" analysis. Similarly, DWSD pays no interest to customers it overcharges and collects no interest from customers it undercharges. Plaintiff has failed to establish that the equities in this case require that it be treated differently than all other DWSD customers. While the principle of uniformity may work some hardship in some cases, there is no practical alternative in running a large metropolitan sewerage department.

## II. THE LEGISLATIVE GRANT

In 1981, the Michigan legislature passed an appropriations bill, which provides in part:

> The $1,000,000.00 appropriated in section 1 to the Detroit water board shall be distributed by the Detroit water board to those local units of government which are assessed by the Detroit water board for the repairs of the sewer break by 15 mile road in Macomb county. The percentage of the $1,000,000.00 distributed to each local unit of government shall be the same as the percentage of the total assessment for the repairs of the sewer break in Macomb county which the local unit bears.

1981 Mich.Pub. Acts 33. Rather than distributing this grant to those local units of government which were assessed for the

Hayes/15 Mile Road sewer repair, DWSD deposited this money into its construction fund. That fund is used for projects which benefit all DWSD customers.

■ It is clear that the funds appropriated by the Michigan Legislature have not been distributed in the manner specified in the bill. Assuming that the construction fund benefits all DWSD customers, there is no showing that those local units of government who bore the Hayes/15 Mile Road repair costs enjoy the benefit of the legislative grant in the same proportion in which they bore those costs. Accordingly, DWSD must, as the Michigan Legislature specified, distribute this money to those who bore the cost of repairing the Hayes/15 Mile Road interceptor in the same percentage as those costs were borne.

As plaintiff's counsel agreed during the November 15, 1984 hearing, this distribution could best be handled through the "look-back" analysis. For the reasons discussed above, DWSD need not pay any interest on these funds.

### III. EPA SET–OFF

Plaintiff's final claim for relief in this motion concerns the amount of an EPA grant awarded to Detroit for the Hayes/15 Mile Road permanent repair project. The EPA reduced this grant by more than $700,000 in order to comply with its policy against second-time funding. Plaintiff argues that in a July 6, 1981 proceeding, counsel for the EPA represented that the EPA would perform a "paper transaction," thus avoiding the need to set-off the original cost of the Hayes/15 Mile Road interceptor from the grant awarded to Detroit to repair that interceptor. Plaintiff also argues that even if the EPA is entitled to this set-off, it has been inaccurately calculated. I need not address the merits of this claim since I am without jurisdiction to decide it.

The Tucker Act, 28 U.S.C. § 1491 (1982) provides in part:

The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

In interpreting this statute, most courts have held that the Claims Court has exclusive jurisdiction of contractual claims against the United States in excess of $10,-000. *Schulthess v. United States,* 694 F.2d 175, 178 (9th Cir.1982) ("In general, except for claims sounding in tort, the United States Claims Court has exclusive jurisdiction over actions against the United States in excess of $10,000."); *Keller v. Merit Systems Protection Board,* 679 F.2d 220, 223 (11th Cir.1982) (District Court's resolution of plaintiff's claim for reinstatement "substantially infringed on the Court of Claims' exclusive jurisdiction over appellee's backpay claim."); *Chelsea Community Hospital v. Michigan Blue Cross Association,* 630 F.2d 1131, 1136 (6th Cir.1980) ("The Court of Claims has exclusive jurisdiction of claims against the United States whenever, as in this case, the amount claimed exceeds $10,000, and the claim does not sound in tort.").

■ When, as in this case, a litigant ultimately seeks monetary relief against the EPA based on grant agreements, the District Court is without jurisdiction. *Metropolitan Saint Louis Sewer District v. Ruckelshaus,* 590 F.Supp. 385 (E.D.Mo. 1984); *Heart of the Valley Metropolitan Sewerage District v. EPA,* 532 F.Supp. 314 (E.D.Wis.1981); *Concerned Citizens v. Costle,* 468 F.Supp. 21 (E.D.Pa.1978), *affd.* 592 F.2d 164 (3d Cir.1979). While plaintiff attempts to characterize its claim as one for enforcement of a court order, and not one for monetary relief, it is clear that plaintiff seeks over $700,000 from the EPA, and therefore, its claim properly belongs in the Claims Court.

■ Finally, plaintiff seeks to avoid the operation of the Tucker Act by arguing

that the EPA instituted this lawsuit, and that the Tucker Act only addresses claims instituted against the United States. The law, however, is to the contrary. *See United States v. 6.321 Acres of Land*, 479 F.2d 404, 407 (1st Cir.1973) ("[S]ince the counterclaim in question is based on an alleged breach of contract and sums in excess of $10,000 are in issue, it is clear, under the Tucker Act ... that it may be heard only in the Court of Claims."); *United States v. 40.60 Acres of Land*, 483 F.2d 927, 928 n. 1 (9th Cir.1973) ("[T]here is no question that a counterclaim cannot be maintained in the District Court if the amount sought exceeds $10,000."); *Concerned Citizens*, 468 F.Supp. at 25. Accordingly, this Court is without jurisdiction to hear plaintiff's claim for monetary relief against the EPA.

## IV. CONCLUSION

For the reasons discussed herein, IT IS HEREBY ORDERED that Macomb County's motion for summary judgment is GRANTED only insofar as it seeks distribution of the grant from the Michigan Legislature. In all other respects, the motion is DENIED.