**ACCEL INTERNATIONAL CORPORATION, et al., Plaintiffs,**

v.

**LYNDON LIFE INSURANCE COMPANY, et al. Defendants.**

No. C2–98–486.

United States District Court, S.D. Ohio, Eastern Division.

March 28, 2001.

James Snoffner Savage, III, McFadden, Winner & Savage, Columbus, OH, for plaintiffs.

Richard A Frye, Chester Willcox & Saxbe, Columbus, OH, William R. Bay, Roman P. Wuller, Christopher M. Hohn, Thompson Coburn, St. Louis, MO, for Lyndon Life Ins. Co., Lyndon Ins. Group, Inc., defendants.

Philip Albert Brown, Vorys, Sater, Seymour & Pease, Columbus, OH, for movant.

### MEMORANDUM AND ORDER

HOLSCHUH, District Judge.

This matter is before the Court on Plaintiffs' motion for partial summary judgment (Record 22) and Defendants' motion for partial summary judgment (Record 31).

## I. Background

Plaintiffs Accel International Corporation and Acceleration National Insurance Company (collectively "Accel"), commenced this action against Defendants Lyndon Life Insurance Company, Lyndon Life Insurance Group, Inc., and Lyndon Property Insurance Company, (collectively "Lyndon") on May 7, 1998. This action arises from the parties' October 27, 1997 Stock Acquisition Agreement ("the Agreement"), pursuant to which Plaintiffs agreed to sell and Defendants agreed to purchase all of the issued and outstanding stock of three of Plaintiff's operating subsidiaries, Acceleration Life Insurance Company ("ALIC"), Dublin International Limited ("Dublin"), and Acceleration National Service Corporation ("ANSC") (collectively "the Target Corporations").

### A. The Agreement

Accel and Lyndon entered into the Agreement on October 20, 1997. The purchase price was set at $30.2 million. However, the purchase price was subject to a post-closing adjustment, depending upon an independent auditor's opinion as to the combined stockholders' equity of the Target Corporations as of December 31, 1997, determined in accordance with generally accepted accounting principles (the "Combined GAAP Equity"). Accel and Lyndon chose KPMG Peat Marwick, LLP, ("KPMG") independent certified public accountants, to conduct the audit. (Section 4.11(ii)).

Section 4.11(iii) of the Agreement provides that if the Combined GAAP Equity exceeded $31.6 million, the purchase price would be increased by an amount equal to the difference between the Combined GAAP Equity and $31.6 million, which would be paid by Lyndon to Accel. On the

other hand, if the Combined GAAP Equity was less than $31.6 million, the purchase price would be decreased by an amount equal to the difference between the $31.6 million and the Combined GAAP Equity, and Accel would owe that amount to Lyndon. Any difference required to be paid because of the price adjustment was to be paid by May 5, 1998.

Under Article 4 of the Agreement, entitled "Conduct Pending Closing," Accel covenanted that it would comply with and would cause the Target Corporations to comply with the following covenants from the date of the Agreement until December 31, 1997:

4.1 *Conduct of the Business.* ALIC, Dublin, and ANSC shall each, consistent with past practice, conduct its business in the ordinary course, maintain adequate insurance, preserve intact its business organization and employees, maintain satisfactory relationships with its independent agents, reinsurers and others having business relationships with it, maintain its books and records in its usual manner and not make any change in its financial reporting, or accounting practices or policies unless required by GAAP, SAP, or in its reserving practices or policies.

4.2 *Certain Prohibited Activities.* Neither ALIC, Dublin, nor ANSC shall: ... (ix) make or cause to be made any alteration in the manner of keeping its books, accounts or records or in the accounting practices and principles therein and theretofore reflected, including its reserving practices and policies, except as required by law or changes in the Insurance Law of each applicable state.

Although the closing was effective as of December 31, 1997, the actual closing did not occur until January 7, 1998, and Accel remained in control of the management of the Target Corporations until that time.

(March 20, 2000 Carliano Aff., at ¶ 13, Rec. 31, Ex. C). The Agreement is governed by New York law, (Agreement, § 13.7) and includes an integration clause which provides that Agreement contains the entire understanding of the parties with respect to the subject transaction. (*Id.* at § 13.10).

**B. The Dispute**

KPMG conducted the audit and gave an unqualified opinion that the combined balance sheet fairly presented the financial condition of the Target Corporations as of December 31, 1997, in accordance with generally accepted accounting principles consistently applied (Farrell Aff. at ¶¶ 2, 3, Rec. 22, Ex. A). KPMG determined the Target Corporations' Combined GAAP Equity as of December 31, 1997 to be $32,155,879, which was $555,879 more than the $31,600,000 benchmark. According to these figures, Lyndon would owe Accel $555,879 by May 5, 1998.

Lyndon received the GAAP audited combined balance sheet on April 8, 1998, and soon after expressed disagreement with the amounts reported for two balance sheet accounts. (April 15, 1998 Memorandum from Gregg Cariolano to Thomas Friedberg, Record 1, Ex. B).

The first account at issue was the "insurance claim reserves." (Record 1, Ex. B). According to Lyndon, the claim reserves should have totaled $13,124,000, instead of the $12,764,000 reflected on the combined balance sheet. Lyndon maintained that Acceleration Life's employees had originally calculated the reserves to be $13,124,000, based upon "reserve methodologies that had been utilized at the end of 1996 and through the first three quarters of 1997," but that Accel had subsequently reduced the reserves by $360,000, to $12,764,000. (*Id.*).

The second account at issue was the amount of deferred tax liability, $2,664,000, reported on the balance sheet. (Rec.1, Ex. B). A Phase III deferred tax liability,[1] which had been carried in previous years was completely eliminated on the combined balance sheet. This reserve totaled $784,597 at December 31, 1995, $784,597 at December 31, 1996, and $736,279 at June 30, 1997. The reserve was reduced to $536,279 in the September 30, 1997 financial statements, and was completely eliminated by Accel in the December 31, 1997 balance sheets. (*Id.*) In Lyndon's opinion, the reserve should not have been eliminated, nor should it have been reduced to $536,279 in the September, 1997 financial statements which were prepared after the Agreement was signed. (*Id.*). Instead, the entire Phase III deferred tax liability should have been maintained at its previous level in order to be consistent with prior practice. (*Id.*).

Lyndon notified Accel that in its opinion, the change in the claim reserves and the elimination of the Phase III deferred tax liability were not consistent with prior reporting and reserving policies and practices, nor required by law, GAAP, or SAP, and thus violated of the terms of the Agreement. Lyndon concluded that the correct amount of the GAAP Combined Equity was $31,158,300, and thus Accel owed Lyndon $441,700.

In a April 29, 1998 memorandum, (Complaint, Ex. C) Accel responded to Lyndon's disagreement with the balance sheet accounts. With respect to the insurance claim reserves, Accel's CEO Thomas Friedberg explained:

For years, even preceding my tenure, the CEO of ACCEL determined the reported reserve level of the operating companies after reviewing the ranges provided by the independent actuary or internal staff. Reserves were never discussed with me at year end 1997. When I finally learned of the 1997 reserves in March 1998, I followed the historical practice of considering the independent actuary's range or select point in determining the acceptable reserves. The reserves eventually recorded in the combined balance sheet represent the midpoint of the independent actuary's range. (Complaint, Ex. C at 1).

As to the elimination of the Phase III deferred tax liability, Friedberg explained that Accel follows a policy similar to that for the insurance claims reserves:

Similarly, company policy has been for the CEO to determine the final reported level of Phase III tax reserves on the financial statements. Historically, the Phase III tax reserve was periodically adjusted based upon the anticipated likelihood that a distribution might take place which would trigger Phase III taxes. The Phase III tax reserve was reduced as of September 1997 in anticipation of the final reduction as of December 1997 since it was known there would be no further distributions. Consistent with past practice, I determined the amount of the discretionary Phase III tax reserve for the statements for year-end December 31, 1997 to be 0. Indeed, it is our position that the entire deferred tax liability in the additional amount of $2,664,395 should be eliminated and ACCEL should be reimbursed for the deferred tax liabilities as a result of the 338(h)(10) election ("election") which was included in the Agreement as an accommodation to Lyndon. Since

---

1. "Phase III Tax Reserve" refers to the $736,279 liability set aside for the taxes imposed, under the Internal Revenue Code of 1986, Section 801(c), on distributions from the pre–1984 Policyholders Surplus Account carried on the books of ALIC as of June 30, 1997. *See* Record 37, Ex. A "Definitions."

ALIC's deferred tax liabilities principally related to DPAC, the election causes the deferred taxes attributable to DPAC to become currently payable by ACCEL. ACCEL could not allocate any portion of the tax caused by this election because all intercompany tax allocation agreements were canceled on the closing date.

KMPG could not issue an unqualified audit opinion at the time it was required without knowing that the other party to the agreement (Lyndon) had agreed to the deferred tax presentation. In an effort to not delay the issuance of the combined balance sheet further, we released the combined balance sheet with deferred taxes included. Our discussion with tax advisors confirmed our position that logically the deferred taxes should be eliminated as a result of the election. Further support for our position exists in that ACCEL is responsible for taxes prior to the sale and therefore should be entitled to the removal of the provision for deferred taxes prior to the sale. Moreover, we are not precluded by any specific language in the Agreement from eliminating deferred taxes.

Thus, according to Accel, the entire deferred tax liability of $2,664,395 should have been eliminated and added to the combined balance sheet, which would yield a total combined stockholders' equity of $34,820,274, meaning that Lyndon would owe Accel $3,220,274 by May 5, 1998. (*Id.* at 2).

Accel commenced this action on May 7, 1998 (Complaint, Record 1). In its complaint, Accel seeks a declaration of the correct amount of the post-closing adjustment of the purchase price, and judgment against Lyndon for the sum of $3,220,274 plus interest. In its answer (Record 2), Lyndon asserted a counterclaim for breach of contract, alleging that in violation of Section 4.1 and 4.2(ix) of the Agreement,

Accel modified the method for calculating insurance reserves and eliminated a $736,279 tax reserve, which departed from past accounting and reserving practices. According to Lyndon, these breaches resulted in the Combined GAAP Equity being overstated by $997,579 (representing the sum of the after-tax effect of the decrease in the insurance claim reserve and elimination of the tax liability reserve). Thus, according to Lyndon, the correct Combined GAAP Equity is $31,158,300, which means that Accel owes Lyndon $441,700.

Accel filed an amended complaint on December 7, 1998, (Record 11) adding a new plaintiff, Acceleration National Insurance Company, and a new defendant, Lyndon Property Insurance Company. Plaintiff also added a third claim for relief regarding an unrelated asset purchase agreement between Accel and Lyndon Property. This second transaction is not before the Court at this time.

On March 19, 1999, Accel moved this Court for partial summary judgment seeking $555,879, the amount by which the Combined GAAP Equity ($32,155,879) exceeds the $31,600,000 purchase price established in the Agreement. (Record 22 at 3). Accel asserts that the KMPG's determination of the Combined GAAP Equity is conclusive, and absent evidence of fraud or a bad faith mistake, Lyndon is bound by KPMG's determination. Lyndon filed a response to this motion on May 5, 1999, (Record 25) and Accel replied on June 7, 1999 (Record 30). On March 22, 2000, Lyndon moved for partial summary judgment on the issue of Accel's claim that the entire deferred tax liability should be eliminated. (Record 31). Accel responded to this motion on May 19, 2000 (Record 34). Although Lyndon was granted an extension of time to reply (Record 36), Lyndon failed to do so.

The Court turns now to the motions for partial summary judgment.

## II. Discussion

### A. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides:

> [Summary judgment] ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Under this standard, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *See Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is ... [and where] no genuine issue remains for trial ... the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *See Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). *Accord Oakland County v. City of Berkley*, 742 F.2d 289, 297 (6th Cir.1984).

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (footnote omitted). *Accord Adams v. Union Carbide Corp.*, 737 F.2d 1453, 1455–56 (6th Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). Inferences to be drawn from the underlying facts contained in such materials must also be considered in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Ass'n*, 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *See Adickes*, 398 U.S. at 157–60, 90 S.Ct. 1598. If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient;

there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

**B. Accel's Motion for Partial Summary Judgment (Record 22, 25, 30)**

██ In its motion for partial summary judgment, Accel asserts that it is entitled to $555,879, the difference between the Combined GAAP Equity as certified by KPMG, and the $31.6 million benchmark purchase price established in the Agreement. Accel's basic argument in support of the motion is that under the terms of the agreement, KPMG's audit is conclusive, and because Lyndon cannot present evidence of fraud or a mistake implying bad faith, Lyndon is bound by the Combined GAAP Equity certified by KPMG. In support of its motion, Accel presents the auditor's report and the affidavits of Rod Farrell, the KPMG partner responsible for auditing the combined balance sheet, and Cindy Moore, Senior Vice President, Chief Financial Officer and Treasurer of Accel International Corporation. (Record 22, Exs. A and B).

In response, Lyndon argues that by departing from historical reserving practices, Accel skewed the independent auditor's valuation of the combined equity, and should not be able to assert the conclusiveness of the auditor's report as a shield. Lyndon does not question the reliability of

the auditor's report *per se;* rather, Lyndon attacks the information upon which that report relied. In other words, Accel's breaches of the Agreement undermined the reliability and independence of the auditor's review and manipulated the Combined GAAP Equity valuation. Lyndon argues that Accel's $360,000 reduction of the insurance claims reserves, and the total elimination of the Phase III deferred tax liability reserve, constitute significant departures from historical reserving and accounting practices, which were not required by GAAP, SAP, or the law. In response to Accel's assertion that the corporations' policies permitted such discretion, Lyndon points out that Accel has failed to present a written policy or any evidence that reserves were ever previously altered in a similar manner based upon such a policy. (Record 25 at 6). Lyndon notes that although these adjustments may have been made after December 31, 1997, the closing date and the expiration of Accel's obligations under the Agreement, the adjustments were effective as of December 31, 1997. (*Id.*). Lyndon argues that the factual dispute regarding Accel's compliance with the terms of the Agreement precludes partial summary judgment. (*Id.* at 11). In support of its opposition to the motion, Lyndon presents the April 30, 1999 affidavit of Gregg Carliano, Chief Financial Officer of Lyndon Insurance Group, Inc. (Record 25, Ex. A) and Plaintiffs' Responses to Defendants' First Set of Interrogatories (Record 25, Ex. B).

In its Reply, Accel makes three basic arguments in support of summary judgment. First, KPMG certified that the audited balance sheet "presented fairly" the Target Corporations' "financial condition" in "accordance with generally accepted accounting principles consistently applied," and KPMG used "generally accepted auditing standards ... to obtain reasonable assurance about whether the combined

balance sheet is free of material misstatement" (Record 30 at 1). Accel argues that the audit complies with the terms of the Agreement, and thus absent evidence of fraud or manifest mistake, the audited balance sheet is conclusive. Second, Accel argues that because its obligations under Sections 4.1 and 4.2, which required it to adhere to past historical practices, expired on December 31, 1997, and the adjustments at issue occurred after December 31, 1997, the adjustments could not, as a matter of law, constitute breaches of the agreement. (Record 30 at 5; Record 34 at 8; Moore Aff. ¶ 4, Record 22, Ex. B). Finally, Accel argues that Lyndon cannot establish a manifest mistake to defeat the conclusiveness of KPMG's determination.

The Court finds that Accel's compliance with the terms of the Agreement presents genuine issues of material fact which preclude summary judgment. Viewing the facts in the light most favorable to Lyndon, the non-moving party, if Accel deviated from its historical accounting and reserving practices, then it breached the Agreement, and the independent auditor's determination provided for in the agreement is not conclusive as to the Combined GAAP Equity. KPMG characterized its audit of the combined balance sheet as follows:

> We conducted our audit in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the combined balance sheet is free of material misstatement. An audit of a combined balance sheet includes examining, on a test basis, evidence supporting the amounts and disclosures in that combined balance sheet. An audit of a combined balance sheet also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall combined balance sheet presentation.

> We believe that our audit of the combined balance sheet provides a reasonable basis for our opinion.

(Independent Auditor's Report, March 13, 1998, Record 22, Ex. A1).

Clearly, the purpose of KPMG's audit was to determine if Accel followed sound accounting principles. The Agreement did not provide KPMG with instructions on how it should determine stockholders' equity, or how any of the constituent components of the balance sheet were to be calculated, nor did it provide for any special adjustments. (Record 34 at 5). The parties agreed that KPMG would simply audit the combined balance sheet in accordance with generally accepted accounting principles. (*Id.*). As Accel notes, "the purpose of an audit in accordance with generally accepted accounting principles is to ferret out 'inaccurate' or 'misinformation.'" *See* Record 34 at 7. The parties do not dispute that the audited combined balance sheet complies with the generally accepted accounting principles. (*Id.*). However, in arguing that Lyndon is bound by KPMG's determination of the combined GAAP Equity, Accel fails to make a crucial distinction between the nature of KPMG's audit and its own obligations under the Agreement. While the balance sheet may have reflected sound accounting principles as certified by KPMG, it does not necessarily follow that Accel followed its historic reserving and accounting practices as it was required to do under the Agreement. In other words, a determination by KPMG that the combined balance sheet complied with generally accepted accounting principles does not necessarily preclude a claim by Lyndon that Accel breached its duties set forth in section 4.1 and 4.2(ix) of the Agreement. The cases cited by Accel in its motion and reply regarding the conclusiveness of an accountant's determination are not applicable to this case, because in those cases, the *method* of determining

value was at issue. In contrast, Lyndon is not challenging the method employed by KPMG in conducting the audit, nor is Lyndon simply disagreeing with KPMG's determination. Instead, Lyndon is asserting a claim for breach of contract against Accel.

Accel maintains that with respect to the insurance claim reserves and the Phase III tax liability, it followed its past accounting and reserving practices. In contrast, Lyndon asserts that Accel deviated from its past practices and thus violated the covenants set forth in the Agreement. This presents a genuine issue of material fact which may not be resolved on a motion for summary judgment.

Additionally, the Court is not persuaded by Accel's argument that because its obligations under the Agreement expired on December 31, 1997, Lyndon cannot maintain a cause of action for breach of contract. As Lyndon points out, even though the adjustments were made after December 31, 1997, the adjustments were effective as of December 31, 1997, and thus Accel was bound by the covenants set forth in the Agreement when it made the adjustments.

Accel is not entitled to summary judgment because genuine issues of material fact remain regarding Accel's accounting and reserving practices with respect to the elimination of the Phase III deferred tax liability and the reduction of the insurance claims reserve. The Court hereby DENIES Accel's motion for partial summary judgment (Record 22).

## C. Lyndon's Motion for Partial Summary Judgment (31, 34)

■ As explained in Accel's April 28, 1998 letter to Lyndon (Complaint, Ex. C), Accel maintains that in addition to the Phase III deferred tax liability which was eliminated, the entire deferred tax liability in the amount of $2,664,395 should have

been eliminated. Lyndon seeks summary judgment on this issue, (Record 31) arguing that because KPMG refused to eliminate this entire liability, Accel has failed to satisfy a condition precedent to Lyndon's payment obligation, the presentation of a balance sheet audited by KPMG which eliminates the entire deferred tax liability. Lyndon further argues that even if KPMG had certified a combined balance sheet which excluded the entire deferred tax liability, a total elimination of the liability would constitute a breach of the Agreement, because such an elimination would violate Accel's historic accounting practices.

In its response to Lyndon's motion, Accel states that both its motion for partial summary judgment and Lyndon's motion for partial summary judgment are "based on the same undisputed facts," and "rely upon the same basic principles of law," and concludes that "both motions should be granted." (Record 34 at 1).

The Court finds that Lyndon's motion for partial summary judgment, regarding the issue of the elimination of the entire deferred tax liability, should be granted. As Accel has emphasized with respect to its own motion for summary judgment, absent evidence of fraud or a mistake implying bad faith, the independent auditor's valuation is conclusive. KPMG refused to give an unqualified opinion if the entire deferred tax liability was eliminated. As a consequence, Accel did not eliminate the entire deferred tax liability, and thus the combined GAAP Equity as certified by KPMG includes the entire deferred tax liability. Even if Accel were entitled to eliminate the liability, it has not satisfied the condition precedent of presenting Lyndon with an audited balance sheet which eliminates the entire deferred tax liability. Thus, because the condition precedent as established in the Agreement has not been

satisfied, Lyndon has no payment obligation with respect to the $2,664,395 deferred tax liability.

The Court hereby **GRANTS** Lyndon's motion for partial summary judgment (Record 31).

### *CONCLUSION*

For the reasons set forth herein, the Court **DENIES** Accel's motion for partial summary judgment (Record 22) and **GRANTS** Lyndon's motion for partial summary judgment (Record 31).

**IT IS SO ORDERED.**