782 F.2d 609
 1986-1 Trade Cases 66,932
 John M. STONE, M.D., Plaintiff-Appellant, Cross-Appellee,
v.
WILLIAM BEAUMONT HOSPITAL, Seymour Gordon, M.D., Gerald
Timmis, M.D., and Gordon-Timmis & Associates,
P.C., Defendants-Appellees, Cross-Appellants.
 Nos. 84-1086, 84-1149.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 1, 1985.
Decided Jan. 30, 1986.
 
 Andrew J. Broder, Martha B. Goodloe, Bodman, Longley & Dahling, Michael B. Lewiston (argued), Troy, Mich., for plaintiff-appellant, cross-appellee.
 Philip J. Kessler (argued), Gregory V. Murray, Butzel, Long, Gust, Klein, Van Zile, Eugene Driker (argued), Sharon M. Woods, Charles S. Rudy, Andrew Zack, Detroit, Mich., for defendants-appellees, cross-appellants.
 Before MARTIN and KRUPANSKY, Circuit Judges, and HOLSCHUH, District Judge*.
 KRUPANSKY, Circuit Judge.
 
 
 1
 Plaintiff John M. Stone, M.D. (Stone) appealed the summary judgment entered in favor of defendants William Beaumont Hospital (Beaumont), Seymour Gordon, M.D. (Gordon), Gerald Timmis, M.D. (Timmis), and Gordon-Timmis & Associates, P.C. (GTA). Plaintiff's complaint, as amended, alleged that Beaumont's denial of Stone's application for staff privileges resulted from concerted activity by the defendants in contravention of federal and state antitrust laws. Specifically, Count 1 alleged violations of the Sherman Act, 15 U.S.C. Secs. 1 and 2, and sought injunctive relief and treble damages pursuant to the Clayton Act, 15 U.S.C. Secs. 15 and 26. Count 2 presented pendent state claims under the Michigan antitrust statutes, M.S.A. Secs. 28.31 and 28.62 [M.C.L.A. Secs. 445.701, 445.762].
 
 
 2
 Stone's relationship with Beaumont commenced in the late 1960's when he accepted a position on the hospital's medical staff. Shortly thereafter, Stone, a cardiologist, was offered the job of developing the "non-invasive"[1] cardiac laboratory procedures at Beaumont. Stone declined this offer and in 1972, left Michigan and relocated in Illinois for "personal reasons."
 
 
 3
 When Stone returned to the Detroit area in the fall of 1973, he became director of the catheterization facilities at Harper Hospital (Harper) in the Detroit Medical Center, a position which he continues to occupy. In addition to his administrative responsibilities at Harper, which Stone characterized as consuming 75 percent of his time, Stone maintains an extensive private cardiology practice. In conjunction with his practice, he has obtained staff positions at six other hospitals, namely, Crittenton, Detroit Receiving, Heritage, the Troy branch of Beaumont, the Grace branch of Northwest, and Lynn Hospital.
 
 
 4
 Prior to Beaumont's unsuccessful solicitation of Stone to develop the hospital's non-invasive cardiology procedures, Beaumont had recruited Gordon and Timmis to develop and oversee the invasive techniques in Beaumont's cardiology department. Commencing in the mid-1960's, Gordon and Timmis formed GTA, through which they proceeded to expand Beaumont's cardiology division from virtually a nonexistent department to a full service state-of-the-art enterprise. In 1978, Beaumont's administration decided to further enlarge the hospital's cardiology division, a move which was not supported by Gordon and Timmis. According to Dr. Weintraub (Weintraub), Beaumont's Director of Medical Services, the purpose of the expansion was to maximize the use of Beaumont's cardiovascular surgical facilities. At the same time, however, the hospital was not desirous of overburdening its catheterization facilities. Toward this end, a physician's profile was derived to define characteristics which would complement Beaumont's expansion plan.
 
 
 5
 As explained by the district court, the profile developed by Weintraub identified two potential sets of characteristics which would conform to Beaumont's expansion plan. The first group was personnel, such as GTA physicians, who could be "full-time geographic"[2] at Beaumont. The second set was comprised of physicians who had access to catheterization facilities at other nearby hospitals, but who would perform cardiac surgery procedures at Beaumont. Members of this latter group would also be required to be associated with physicians who could provide back-up care for their patients at Beaumont.
 
 
 6
 Upon learning of the planned expansion, Stone applied for staff privileges at Beaumont. When interviewed by Weintraub, Stone stated that he would retain his position at Harper and that he would at most use Beaumont's catheterization facilities two or three times per month. During a deposition, Weintraub averred that upon conclusion of the interview, he immediately and unilaterally determined that Stone did not meet the hospital's expansion profile, and thus resolved that Stone's application should be denied.
 
 
 7
 After notification of his rejection, Stone received a full administrative hearing before Beaumont's Appeals Committee, during which he was assisted by legal counsel. Despite Stone's allegations of a GTA monopoly and/or conspiracy regarding Beaumont's cardiology division, the Appeals Committee affirmed Weintraub's decision to deny Stone's application for staff privileges. Two committee members whom Stone later deposed, Dr. Westfall (Westfall) and Dr. Catto (Catto), both testified that neither Gordon or Timmis nor anyone associated with GTA influenced their respective decisions to deny Stone staff privileges at Beaumont. To the contrary, Westfall and Catto cited reliance on Weintraub's evaluation of Stone as an inappropriate candidate due to his heavy commitments to other hospitals, his lack of back up capacity at Beaumont, and the fact that Stone's association with Beaumont would not further the institution's objectives of maintaining a staff of full-time geographic cardiologists.
 
 
 8
 Although Stone's application was denied, six cardiologists who were not affiliated with Gordon or Timmis or GTA were admitted to the Beaumont staff and granted catheter lab privileges. When the district court granted summary judgment for defendants, there were 17 cardiologists on Beaumont's staff who routinely performed catheterization, ten of whom were not affiliated with the Gordon-Timmis group. Of the ten non-GTA physicians, nine had catheterization privileges. The GTA personnel were all full time at Beaumont and remained the primary users of the catheterization facilities. Beaumont also maintained its long-standing practice of allowing all EKG readings to be performed by GTA associates.
 
 
 9
 Following the Appeals Committee's decision, Stone initiated the instant action. As observed by the district court, the thrust of plaintiff's federal antitrust claim is incorporated in paragraph 18 of his original complaint, which alleges:
 
 
 10
 The refusal to permit Dr. Stone to practice at defendant Hospital has prevented Dr. Stone from competing with those Hospital staff and cardiologists and the Gordon Timmis P.C. for general cardiology practice at defendant Hospital and constitutes a combination and conspiracy among defendants Hospital, Gordon, Timmis, and Gordon Timmis, P.C. to boycott Dr. Stone and thereby to restrain trade and commerce as hereinabove alleged, all in violation of Sec. 1 of the Sherman Act, 15 U.S.C. Sec. 1, and to monopolize the trade and commerce hereinabove alleged in that defendant Hospital has afforded to defendants Gordon, Timmis and Gordon Timmis P.C. monopolistic control and access to the defendant Hospital cardiology practice to the detriment of competing cardiologists and have acted in concert with each other to prevent entry by Dr. Stone as a competitor in that trade and commerce, all in violation of Sec. 2 of the Sherman Act, 15 U.S.C. Sec. 2.
 
 
 11
 Based on the foregoing, the district court first determined that the plaintiff had sufficiently established the necessary "interstate commerce" nexus to invoke the Sherman Act. However, after reviewing the voluminous materials submitted in support of and in opposition to defendants' motion for summary judgment, the court further determined that (1) plaintiff had provided no evidence whatsoever which supported the charges that a conspiracy existed between the hospital and GTA to monopolize or restrain trade; (2) the "physician's profile" utilized in 1978 to select new doctors for Beaumont's cardiology department was devised for legitimate medical and business needs rather than, as plaintiff urged, a pretext to coverup anticompetitive practices; (3) plaintiff's attempted monopolization and monopolization claims were similarly without merit; and (4) the federal court was without jurisdiction to entertain the pendent state claims. In response to a motion filed by defendants, the district court subsequently clarified its opinion by deleting reference to "attempted monopolization," having decided that plaintiff had not raised that issue in his pleadings. From this disposition of his case, plaintiff appealed.
 
 
 12
 In every federal antitrust case, the critical threshold inquiry is whether a sufficient nexus existed between the parties' activities and interstate commerce, thus bringing the claim within the Sherman Act's parameters. In the instant case, the district court concluded such a nexus derived from the out-of-state funds received by GTA and Beaumont for cardiological procedures, supplies which were purchased and received from out-of-state suppliers, and Stone's out-of-state patient income. This court is not convinced that these elements are sufficient to invoke the Sherman Act's protections.[3]
 
 
 13
 In McLain v. Real Estate Board of New Orleans, Inc., 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), the Supreme Court reiterated that the prerequisite for recovery under a Sherman Act, Sec. 1 claim could be satisfied by showing "either that defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce." 444 U.S. at 242, 100 S.Ct. at 509. Since the operation of Beaumont is local in nature, the "effect on interstate commerce" test is applicable. In applying the "effects upon interstate commerce" test, the circuits are divided, with the Ninth Circuit invoking Sherman Act when any business activity of the defendant effects interstate commerce, Western Waste Service v. Universal Waste Control, 616 F.2d 1094 (9th Cir.), cert. denied, 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980), and the First, Second, Seventh, Eighth and Tenth Circuits invoking it when the particular business activity challenged by the plaintiff effects interstate commerce. Seglin v. Esau, 769 F.2d 1274 (7th Cir.1985); Hayden v. Bracy, et al., 744 F.2d 1338, 1342-1343 (8th Cir.1984); Furlong v. Long Island College Hospital, 710 F.2d 922 (2d Cir.1983); Cordova & Simonpietri Insurance Agency v. Chase Manhattan Bank, 649 F.2d 36, 45 (1st Cir.1981); Crane v. Intermountain Health Care, Inc., 637 F.2d 715, 719-722 (10th Cir.1981) (en banc ). The Sixth Circuit, although aware of the conflict of authority, has not addressed the conflicting interpretations of McLain. See Tarleton v. Meharry Medical College, et al., 717 F.2d 1523, 1528 n. 2, 1532 (6th Cir.1983); James R. Snyder Co., Inc. v. Associated General Contractors, 677 F.2d 1111, 1111 n. 3 (6th Cir.1982). The Supreme Court has recently cited with approval the McLain "effect on interstate commerce" standard for establishing a claim under the Sherman Act, but has provided no additional guidance which would resolve the disparity between the circuits. See, Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 104 S.Ct. 1551, 1571 n. 5, 80 L.Ed.2d 2 (1984) (Brennan, J., concurring). However, a recent Second Circuit opinion sheds some light on this subject.
 
 
 14
 In Furlong v. Long Island College Hospital, 710 F.2d 922 (2d Cir.1983), the court addressed, as here, a claim that a hospital and various staff members acted in concert to deprive a physician of staff privileges in restraint of trade. Similar to the matter at bar, the ultimate Sherman Act interstate commerce nexus was alleged to arise from the purchase of hospital supplies and services, interstate third patient payments, and federal construction subsidies. Id. at 924. The Furlong district court dismissed the claim as beyond the scope of the Sherman Act. On appeal, the Second Circuit interpreted McLain in examining the parameters of the defendant's business activity. The critical conclusion articulated in Furlong was that the allegedly unlawful conduct itself must be shown to "infect" those general business activities of the defendant which do, or are likely to, effect interstate commerce. Indeed, this appears to be the plain import of the Supreme Court's own formulation of the jurisdictional standard, which states that if the contested practice "is local in nature," that is, not itself in interstate commerce, then the challenged conduct must be shown to have "an effect on some other appreciable activity demonstrably in interstate commerce." 444 U.S. at 242, 100 S.Ct. at 509 (emphasis added). The Second Circuit opined:
 
 
 15
 We agree with the First and Tenth Circuits that it would not be prudent to extract from McLain a generalized rule that antitrust jurisdiction can be established simply by showing that some aspects of a defendant's business have a relationship to interstate commerce. Rather the inquiry must be whether the defendant's activity that has allegedly been "infected" by unlawful conduct can be shown " 'as a matter of practical economics' to have a not insubstantial effect on the interstate commerce involved." McLain, supra, 444 U.S. at 246, 100 S.Ct. at 511, quoting Hospital Building Co. v. Rex Hospital Trustees, 425 U.S. 738, 745, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976). The requisite showing will vary with the type of unlawful conduct alleged. With a price-fixing allegation, as in McLain, the link between the "infected" activities and an ultimate effect on commerce was easily posited, since price-fixing is generally recognized as tending to restrict output, and the complaint adequately alleged interstate activities--real estate financing and title insurance--that would be adversely affected if the local brokerage activities of the defendants were diminished. In prior cases, the Court has spelled out in more detail the causal chain by which the alleged illegality could be expected to affect the relevant lines of commerce. Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 235-44, 68 S.Ct. 996, 1005-1010, 92 L.Ed. 1328 (1948). We therefore conclude that a plaintiff must allege sufficient facts concerning the alleged violations and its likely effect on interstate commerce to support an inference that the defendants' activities infected by illegality either have had or can reasonably be expected to have a not insubstantial effect on commerce.
 
 710 F.2d at 926.[4]
 
 16
 Since the instant case is factually identical to the Second Circuit's well-reasoned Furlong opinion, this court adopts the reasoning and disposition articulated therein and concludes that the trial court in the instant case erred in determining that plaintiff had alleged sufficient facts to support an "interstate commerce" nexus to bring the case within the parameters of the Sherman Act. To the contrary, the gravamen of Stone's complaint was that defendants illegally excluded him from using a local facility two or three times a month. This court cannot ascertain how such a deprivation has any more than a de minimis impact on interstate commerce. Consequently, the Sherman Act prerequisites simply have not been satisfied.[5]
 
 
 17
 In view of the foregoing, the lower court's determination that a sufficient interstate nexus was established is reversed, however, the ultimate disposition of the case, that is, the grant of summary judgment for defendants, is AFFIRMED.
 
 
 18
 HOLSCHUH, District Judge, concurring in the judgment.
 
 
 19
 Although all members of this panel agree that the judgment of the district court should be affirmed, there is disagreement as to the proper basis for affirmance. I agree with Judge Krupansky's opinion, which affirms the judgment of the district court on the basis that, in this particular case, plaintiff has failed to meet the jurisdictional prerequisite of the Sherman Act, 15 U.S.C. Secs. 1 and 2, by showing that defendants' allegedly unlawful activity has, as a matter of practical economics, a not insubstantial effect on interstate commerce. I write separately to set forth the reasons for my concurrence and to emphasize the unique facts of this case, because "[i]n this area perhaps more than in most, each case must turn on its own facts." Rasmussen v. American Dairy Association, 472 F.2d 517, 526 (9th Cir.1972), cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973).
 
 I.
 
 20
 Initially, on the question of Dr. Stone's standing to bring this action, I am unable to agree with Judge Martin that the judgment of the district court can be affirmed on this basis.
 
 
 21
 In order to establish standing in an antitrust action, it is required in this Circuit (1) that the plaintiff allege injury in fact; (2) that the interest which the plaintiff seeks to protect is arguably within the zone of interests protected by the statute in question; and (3) that the alleged injury is an antitrust injury. Riverview Investments, Inc. v. Ottawa Community Improvement Corp., 769 F.2d 324, 328 (6th Cir.1985); Chrysler Corp. v. Fedders Corp., 643 F.2d 1229, 1235 (6th Cir.1981). When assessing standing, a court must "focus on the type of injury pleaded and its relationship to the alleged anticompetitive conduct," Chrysler Corp. v. Fedders Corp., 643 F.2d at 1235 (emphasis in original), and this Court has expressly cautioned "against making a determination on the merits under the guise of assessing the standing of the claimant." Chrysler Corp. v. Fedders Corp., 643 F.2d at 1234. See Malamud v. Sinclair Oil Corp., 521 F.2d 1142 (6th Cir.1975). As the Supreme Court said in Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), "[t]he fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated."
 
 
 22
 In the present case, Dr. Stone alleges in the complaint that he was excluded from the cardiology practice at William Beaumont Hospital as the result of the concerted action of the defendants. The alleged conduct of the defendants is described as a combination and conspiracy to boycott plaintiff and to give defendants Gordon, Timmis, and Gordon-Timmis and Associates, P.C. (GTA) monopolistic control over the practice of cardiology at the hospital. In my opinion, the alleged conduct of defendants in preventing plaintiff from entering a relevant market as a competitor is clearly the type of antitrust injury that would confer standing on Dr. Stone. As this Court recently found:
 
 
 23
 In the instant case, plaintiff was a potential competitor in a market allegedly dominated by several of the defendants. Plaintiff's entrance into this market might benefit consumers by lowering prices and providing a greater diversity in products. Plaintiff has, therefore, alleged facts which, if true, constitute an antitrust injury, and hence has standing to bring this action.
 
 
 24
 Riverview Investments v. Ottawa Community Improvement Corp., 769 F.2d at 329.
 
 
 25
 It is not necessary for Dr. Stone to show a present loss of income or other legally cognizable damages in order to have standing as a plaintiff in this action.[1] As Judge Martin acknowledges, a plaintiff may obtain injunctive relief simply by demonstrating a "significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Bender v. Southland Corp., 749 F.2d 1205, 1214 (6th Cir.1984) (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969)). The primary purposes of injunctive relief in such actions are: "(1) putting an end to illegal conduct, (2) depriving violators of the benefits of their illegal conduct, and (3) restoring competition in the marketplace." Arthur S. Langenderfer, Inc. v. S.E. Johnson Co., 729 F.2d 1050, 1059 (6th Cir.1984) (quoting In re Multidistrict Vehicle Air Pollution, 538 F.2d 231, 234 (9th Cir.1976)). In view of these purposes, I do not believe the quantum of threatened injury need rise to some judicially perceived level in order to confer standing on a plaintiff in an action under the antitrust laws.[2] Dr. Stone's alleged exclusion by the defendants from Beaumont Hospital is sufficient, in my view, to demonstrate an "antitrust injury" and to confer standing on him in this action.
 
 
 26
 The mere fact that a plaintiff may have standing to bring an antitrust action does not, of course, answer the other basic jurisdictional question of whether the action itself involves conduct having a not insubstantial effect on interstate commerce.
 
 II.
 
 27
 Judge Martin observes: "As Dr. Stone himself admits, he only intends to use Beaumont catheterization facilities two or three times a month. The possible injury from not being allowed such a limited use of the facilities is de minimis " (Martin, J., Opinion, p. 625). While Dr. Stone's possible injury may be sufficient for standing purposes, the question remains, to paraphrase Judge Martin, whether "[t]he possible effect on interstate commerce from not being allowed such a limited use of the facilities is de minimis, " and therefore insufficient for jurisdictional purposes. The answer to that question depends upon whether McClain v. Real Estate Board of New Orleans, Inc., 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), eliminated the requirement that a defendant's alleged antitrust activity have a not insubstantial effect on interstate commerce. I believe, as does Judge Krupansky, that it did not.
 
 
 28
 I do not believe that McLain gave "clear direction" that the interstate commerce requirement is satisfied by merely showing that the defendant's general business activities have a not insubstantial effect on relevant channels of interstate commerce (Martin, J., Opinion, p. 622). The language relied upon by Judge Martin for this interpretation must be placed in the context of the entire paragraph in which it appeared:
 
 
 29
 To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that are alleged to be unlawful. The validity of this approach is confirmed by an examination of the case law. If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect. This is not the rule of our cases. See American Tobacco Co. v. United States, 328 U.S. 781, 811 [66 S.Ct. 1125, 1139, 90 L.Ed. 1575], (1946); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 225, n. 59 [60 S.Ct. 811, 846 n. 59, 84 L.Ed. 1129] (1940). A violation may still be found in such circumstances because in a civil action under the Sherman Act, liability may be established by proof of either an unlawful purpose or an anticompetitive effect. United States v. United States Gypsum Co., 438 U.S. 422, 436, n. 13 [98 S.Ct. 2864, 2873 n. 13, 57 L.Ed.2d 854] (1978); see United States v. Container Corp., 393 U.S. 333, 337 [89 S.Ct. 510, 512, 21 L.Ed.2d 526] (1969); United States v. National Assn. of Real Estate Boards, 339 U.S. 485, 489 [70 S.Ct. 711, 714, 94 L.Ed. 1007] (1950); United States v. Socony-Vacuum Oil Co., supra, [310 U.S.] at 224-225, n. 59 [60 S.Ct. at 844-846 n. 59].
 
 
 30
 McLain, 444 U.S. at 242-243, 100 S.Ct. at 509 (emphasis in original).
 
 
 31
 While it is clear that it is not necessary to show that allegedly unlawful activity has in fact accomplished its goal by showing a resultant effect on interstate commerce, it does not follow that no connection between that activity and interstate commerce need not be shown. To the contrary, the unlawful activity in question must still be shown to be such that, if allowed to continue, as a practical matter it would have a not insubstantial effect on interstate commerce. McLain tends to support this by the language appearing later in the opinion:
 
 
 32
 To establish federal jurisdiction in this case, there remains only the requirement that respondent's activities which allegedly have been infected by a price-fixing conspiracy be shown "as a matter of practical economics" to have a not insubstantial effect on the interstate commerce involved.
 
 
 33
 McLain, 444 U.S. at 246, 100 S.Ct. at 511 (emphasis added).
 
 
 34
 I believe that McLain reaffirms the proposition that it is enough if, assuming the allegedly illegal restraint were successful, it would in pragmatic terms have a not insubstantial effect on interstate commerce, Crane v. Intermountain Health Care, Inc., 637 F.2d 715 (10th Cir.1980), and that it is not necessary to make a particularized showing in dollars and cents of the exact effect of the unlawful activity on interstate commerce. I do not believe, however, that McLain established a generalized rule that antitrust jurisdiction can be established simply by showing that some aspects of a defendant's general business activities have a not insubstantial effect on interstate commerce.[3]
 
 
 35
 Judge Martin is of the opinion that the Supreme Court's recent decision in Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), supports the broad interpretation of McLain he advocates. As he correctly points out, that case was a "hospital staff privilege case," and the four members of the Court who concurred in the judgment noted: "It is not disputed that such an impact [on interstate commerce] is present here." Id. 104 S.Ct. at 1569, 1571 n. 5. In my view, however, the Hyde case is distinguishable from the present case and does not support the position that the interstate commerce requirement can be satisfied by simply showing that the defendant's business activities in general have a not insubstantial effect on interstate commerce.
 
 
 36
 Hyde involved an exclusive contract between a hospital and a firm of anesthesiologists, whereby all anesthesiological services required by the hospital's patients would be performed by that one firm. As a result of this contract, Dr. Hyde, a board certified anesthesiologist, and all other competitors of the chosen firm were denied admission to the medical staff by the hospital's board. The Court of Appeals held that the case involved a tying arrangement, because the users of the hospital's operating room (the tying product) were also compelled to purchase the hospital's chosen anesthesia service (the tied product). The Court of Appeals recognized that one element of an illegal tying arrangement is that a not insubstantial amount of interstate commerce is in the tied market, i.e., that "a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie..." Hyde v. Jefferson Parish Hospital District No. 2, 686 F.2d 286, 292 n. 10 (5th Cir.1982) (quoting Fortner Enterprises v. United States Steel Corp., 394 U.S. 495, 501, 89 S.Ct. 1252, 1257, 22 L.Ed.2d 495 (1969)). The Court of Appeals found the required volume from the fact that 875 operations per month were performed at the hospital with an estimated total value of anesthesia services per year of over a million dollars--a significant portion of which came through the channels of interstate commerce. Thus, the Court of Appeals noted that "the sum of commerce foreclosed in a year's time amounts to over a million dollars." Hyde, 686 F.2d at 292 n. 10. The exclusion of all competitors from this substantial market for services would easily satisfy the required effect of the alleged illegal tie on interstate commerce.
 
 
 37
 In contrast, the present case does not involve a challenged tying arrangement or even an exclusive contract between the hospital and GTA to exclude all competitors. This case involves, instead, an alleged conspiracy between the hospital and GTA to exclude a single doctor who was already a staff member of at least six hospitals in the Detroit area. Furthermore, Dr. Stone was under a contract with Harper Hospital where he is director of that hospital's catheterization lab, a contract that provides that his "primary medical staff 'loyalty' will be to Harper Hospital and that all of [his] elective cardiac catheterizations will be done at [Harper] [H]ospital exclusively" (Joint Appendix at p. 250). Dr. Stone spends seventy-five percent of his workday at Harper, and his workday is already filled by his responsibilities at Harper and his office practice. Finally, Dr. Stone would use Beaumont Hospital's facilities, according to his own testimony, for only 2 or 3 catheterizations per month. Even those few patients can be treated by Dr. Stone at the numerous other hospitals where he has privileges.
 
 
 38
 I fail to see how, under the unique facts of this case, the denial by Beaumont Hospital of staff privileges to Dr. Stone has a not insubstantial effect on interstate commerce--if the words "not insubstantial" are to have any meaning at all. This is not a case involving a closed staff where the defendants have excluded all physicians who are not members of a particular professional group.[4] It is, instead, a case of a single physician who desires to add yet another hospital to his extensive list of hospital affiliations for the avowed purpose of using it on a very infrequent basis. While I do not doubt that a group boycotting scheme can be shown "as a matter of practical economics" to have an effect on a plaintiff's or a defendant's interstate activities, the mere allegation of such a scheme is not sufficient to establish federal jurisdiction. When challenged, as it was in this case, the plaintiff must bear the burden of producing evidence that the perpetrators' allegedly illegal activity, if local in nature, has a not insubstantial effect on interstate commerce. McLain, 444 U.S. at 242, 100 S.Ct. at 509. In my opinion, under the unique facts of this case, plaintiff has failed to bear that burden. Clearly, the exclusion of Dr. Stone from using the catheterization lab at Beaumont Hospital two or three times a month would not have any appreciable effect on the defendants' activities in interstate commerce or on plaintiff's receipt of funds from out of state insurers. Contrary to the assumption of Judge Martin "that the majority is only willing to look at the alleged violation's effect on Dr. Stone's practice and not at how the purported conspiracy affected defendants' practice" (Martin, J., Opinion, p. 621), I believe that the activities of all parties are relevant to a determination of this jurisdictional issue. It is simply that in this particular case none of those activities has been shown to be substantially affected, "as a matter of practical economics," by the alleged conspiracy to exclude Dr. Stone from his professed desire to use Beaumont Hospital on such a limited basis. Neither the interstate aspects of Dr. Stone's practice nor the interstate aspects of GTA's practice and the hospital's business has been shown to be substantially affected by defendants' alleged conduct. Any effect would be theoretical at best and, in practical economic terms, would clearly be de minimis.
 
 
 39
 Finally, I do not regard the less expansive interpretation of McLain adopted by Judge Krupansky as being inconsistent with a generally expansive view of Congress' commerce power. (Martin, J., Opinion, p. 623). I think the Supreme Court has made it clear that even though the reach of the federal antitrust laws is indeed broad, the necessity of showing a not insubstantial effect on interstate commerce is still a critical requirement for entrance to the federal courts:
 
 
 40
 Although the cases demonstrate the breadth of Sherman Act prohibitions, jurisdiction may not be invoked under that statute unless the relevant aspect of interstate commerce is identified; it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce. To establish jurisdiction a plaintiff must allege the critical relationship in the pleadings and if these allegations are controverted must proceed to demonstrate by submission of evidence beyond the pleadings either that the defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce. Gulf Oil Corp. v. Copp Paving Co., supra [419 U.S. 186], at 202 [95 S.Ct. 392 at 402, 42 L.Ed.2d 378 (1974) ].
 
 
 41
 McLain, 444 U.S. at 242, 100 S.Ct. at 509.
 
 III.
 
 42
 There is, of course, no ready and easy test for determining whether alleged restraints in individual cases have the requisite effect on interstate commerce. Feminist Women's Health Center, Inc. v. Mohammad, 586 F.2d 530, 540 (5th Cir.1978), cert. denied, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). In the absence of more definitive guidance from the Supreme Court, it is likely that courts will continue to be divided, in cases of this nature, on the level of quantitative contact with interstate commerce necessary to satisfy the "not insubstantial effect" requirement.[5]
 
 
 43
 Because Judge Krupansky's opinion is limited to the unusual facts of this particular case, I am convinced a dismissal on the ground that plaintiff failed to establish the required effect on interstate commerce will not result in any major precedent in this area. The significance of this case as precedent is found in the interpretation of McLain adopted by Judge Krupansky, in which I concur and which Judge Martin rejects, and not in the application of McLain to the unique facts presented to us. The majority's interpretation of McLain will not, in my view, foreclose federal courts from assuming jurisdiction in cases where truly, "as a matter of practical economics," a defendant's allegedly wrongful activities have a not insubstantial effect on the interstate commerce involved. It will, however, give recognition to the fact that "interstate commerce is not implicated, for Sherman Act purposes, every time someone is excluded from a staff, organization, association, or other membership." Crane v. Intermountain Health Care, Inc., 637 F.2d 715, 726 (10th Cir.1980). If, as in this case, such an exclusion has at best a de minimis effect on interstate commerce, then the dispute should be resolved by the appropriate state court.
 
 
 44
 BOYCE F. MARTIN, Jr., Circuit Judge, concurring in the judgment.
 
 
 45
 I cannot agree with the majority's conclusion that the appellant's complaint should be dismissed on jurisdictional grounds. I do agree, however, that the summary judgment of the district court should be affirmed but because the appellant has failed to demonstrate any antitrust injury. I therefore concur in the judgment.
 
 I.
 
 46
 Because Judge Krupansky's opinion succinctly states the relevant facts, I shall turn immediately to the legal issues. As the majority properly recognizes, the initial legal hurdle that Dr. Stone must clear is the jurisdictional "interstate commerce" requirement.[1] In Furlong v. Long Island College Hospital, 710 F.2d 922, 925 (2d Cir.1983), the case upon which the majority primarily relies, the court noted that there are two central issues involving the application of the interstate commerce requirement. First, we must decide whether the interstate commerce requirement can be met by showing that the defendant's general business activities affect commerce or whether it must be met by making the more difficult showing that the alleged illegal conduct itself affects interstate commerce. Second, we must decide whether the interstate commerce that is affected relates only to the plaintiff's activities or whether it can also relate to the defendant's activities.
 
 
 47
 As I understand my colleagues' opinions, they adopt the most restrictive answer to both of these questions. With regard to the first question, they clearly follow Furlong in holding that the "defendants' purported illegal activity itself [must] have a 'not insubstantial effect on interstate commerce.' " (Krupansky, J. at 614 n. 4) (emphasis in original). As to the second issue, Judge Krupansky finds Dr. Stone's complaint inadequate because it only alleges "that defendants illegally excluded him from using a local facility two or three times a month." (Krupansky, J. at 614) Judge Krupansky does not discuss whether the alleged antitrust conspiracy in this case, if taken as true, would substantially affect the defendants' contacts with interstate commerce. I therefore assume that he is only willing to look at the alleged violation's effect on Dr. Stone's practice and not at how the purported conspiracy affected defendants' practice.
 
 
 48
 In my view, the Supreme Court in McLain v. Real Estate Board of New Orleans, Inc., 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), decided the first issue in direct contravention to the majority's holding. In McLain, the plaintiffs alleged that real estate brokers in the New Orleans metropolitan area had conspired to fix brokerage commissions on sales of residential property. Chief Justice Burger, speaking for a unanimous Court, held that the plaintiffs' complaint and affidavits in support of the complaint had established the requisite nexus with interstate commerce. In discussing the first question--whether we may look to the defendants' general activities in analyzing the interstate commerce issue--the Supreme Court stated:
 
 
 49
 To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that are alleged to be unlawful. The validity of this approach is confirmed by an examination of the case law. If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect. This is not the rule of our cases.
 
 
 50
 McLain, 444 U.S. at 243, 100 S.Ct. at 509 (emphasis added). In my view, this language definitely and unambiguously rejects the majority's answer to the first question.[2]
 
 
 51
 In addition to Furlong, relied on by the majority, several other lower courts have disregarded what I believe to be clear direction from the Supreme Court. The leading case in this regard is Crane v. Intermountain Health Care, Inc., 637 F.2d 715 (10th Cir.1981) (en banc), where the Tenth Circuit held that, despite McLain, the trial court should only look to the effect the alleged illegal activity had on interstate commerce. Crane, 637 F.2d at 724. The Crane court reasoned that in context the Supreme Court was referring only to the real estate brokers' challenged activities and that the purpose of the above-quoted language was simply to emphasize that the plaintiff need not make a "particularized showing" to meet the interstate commerce requirement. Id. at 723. At least three other circuits have followed this interpretation, most recently the Seventh Circuit in Seglin v. Esau, 769 F.2d 1274, 1280 (7th Cir.1985). See also Hayden v. Bracy, 744 F.2d 1338, 1342-43 (8th Cir.1984); Cordova & Simonpietri Insurance Agency, Inc. v. Chase Manhattan Bank, 649 F.2d 36, 45 (1st Cir.1981).[3]
 
 
 52
 The Crane court's conclusion seems to me to be a strained reading of the McLain opinion. The Crane court ignored the Supreme Court's statement that, "if establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect." McLain, 444 U.S. at 243, 100 S.Ct. at 509 (emphasis added). This language explicitly rejects the view adopted in Crane and now by the majority.[4]
 
 
 53
 While my view is clearly not in accord with the opinions discussed above, I believe that larger constitutional concerns also support my treatment of the issue. As the Supreme Court has frequently recognized, Congress intended the antitrust laws to be coextensive with its commerce power, McLain, 444 U.S. at 241, 100 S.Ct. at 508, and the enormous scope of Congress' commerce power is well documented. See, e.g., Katzenbach v. McLung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). The narrow view of the Sherman Act's interstate commerce requirement espoused by Crane and the majority is simply inconsistent with this generally expansive view of Congress' commerce power. See Note, Sherman Act "Jurisdiction" in Hospital Staff Exclusion Cases, 132 U.Pa.L.Rev. 121, 133-34 (1983). For these reasons, I believe we must look to the defendant's general business activities to determine whether there is the requisite effect on interstate commerce. Accord Hahn v. Oregon Physician Services, 689 F.2d 840, 844 (9th Cir.1982), cert. denied, 462 U.S. 1133, 103 S.Ct. 3115, 77 L.Ed.2d 1369 (1983); Western Waste Service Systems v. Universal Waste Control, 616 F.2d 1094, 1097 (9th Cir.), cert. denied, 449 U.S. 869, 101 S.Ct. 205, 66 L.Ed.2d 88 (1980).
 
 
 54
 The second issue--whether we should look to how the defendants' activities affect interstate commerce in general, including the defendants' interstate activities, or only the plaintiff's role in interstate commerce--was adequately disposed of in Furlong, 710 F.2d at 926, where the court stated:
 
 
 55
 [T]his view [that we should only look to the plaintiff's activities] ignores the rationale behind the Sherman Act's condemnation of such anticompetitive schemes as price-fixing and group boycotting. Such schemes are prohibited because they permit those who perpetrate them to constrict supply, raise prices, and lower output. If output decreases, a defendant's demand for the goods and services it uses will also decrease. Thus, as a matter of substantive antitrust law, there is no defect in a complaint that alleges that a denial of staff privileges, undertaken in furtherance of a price-fixing or group boycotting scheme, may ultimately affect certain of the activities that connect a hospital to interstate commerce.
 
 
 56
 Accord Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center, 721 F.2d 68, 75 (3d Cir.1983). See also Note, Sherman Act "Jurisdiction" in Hospital Staff Exclusion Cases, 132 U.Pa.L.Rev. 121, 139 (1983). I find this reasoning persuasive and believe we should follow it.[5]
 
 
 57
 Thus, in light of McLain, I believe that the plaintiff must simply show that the defendants' general business activities must "as a matter of practical economics" have a "not insubstantial effect" ' on the relevant channels of interstate commerce, including those channels affected by the defendants' businesses. Dr. Stone's complaint easily meets this standard. His complaint alleges in part as follows:
 
 
 58
 11. The trade and commerce affected by the conduct of the defendant Hospital, as hereinafter alleged may be described as the practice of cardiology using the hospital and cardiology facilities of the defendant Hospital.
 
 
 59
 12. The practice of cardiology at the defendant Hospital involves substantial interstate commerce arising from the payment for medical and hospital services and facilities in large measure by federal medicare and medicaid programs and by insurance programs sold and administered by insurance companies outside the State of Michigan.
 
 
 60
 13. Dr. Stone's cardiology practice involves patients who, in most cases, are either economically dependent upon or legally required to resort to use of federal and other interstate payment and insurance programs to finance needed medical care and who reside in the geographic area primarily served by the defendant Hospital. As a matter of fact and practical necessity payment for medical services rendered to patients of Dr. Stone is an integral part of an interstate transaction, since such medical service payments are a part of the interstate receipt of benefits from federal agencies in the District of Columbia.
 
 
 61
 * * *
 
 
 62
 14. The amount of federally funded or paid medical care presently provided at the defendant Hospital, and the amount of federally funded medical care which Dr. Stone would provide at the defendant Hospital but for the defendants' wrongful actions both constitute, on an annual basis, substantial trade of commerce within the meaning of Secs. 1 and 2 of the Sherman Act (15 USC Secs. 1 and 2).
 
 
 63
 The defendants' discovery has in no way disproved any of these jurisdictional allegations. I feel that Dr. Stone has sufficiently established the requisite nexus with interstate commerce to avoid dismissal on that ground.
 
 II.
 
 64
 Because I do not think we can dismiss this case on jurisdictional grounds, I would reach the merits. The district court granted summary judgment on the Sherman Act claim on the ground that Dr. Stone had failed to demonstrate a conspiracy. In summary, the district court found that the hospital administration had unilaterally decided to reject Dr. Stone's claim because he did not meet its criteria for staff privileges. The court reasoned that such unilateral action cannot serve as the basis of an antitrust claim, relying on Smith v. Northern Michigan Hospitals, Inc., 703 F.2d 942 (6th Cir.1983).
 
 
 65
 Whether or not Dr. Stone has presented enough evidence on the conspiracy issue to go to trial is a very difficult issue. Viewing the evidence in a light most favorable to the plaintiff, he arguably has presented evidence showing an implied agreement between the hospital administration and Gordon-Timmis Associates that only Gordon-Timmis Associates will be granted full-time geographic status at Beaumont Hospital. Because we have been admonished: "[s]ummary procedures should be used sparingly in complex antitrust litigation," Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); see also Smith v. Northern Michigan Hospitals, Inc., 703 F.2d at 947, I am somewhat hesitant to affirm on this ground.
 
 
 66
 I do not believe, however, that we need decide this difficult issue to affirm the district court's summary judgment in the case. Instead, I think this case can easily be affirmed on the ground that the appellant has failed to demonstrate the requisite antitrust injury or threat of injury. Although the district court did not rely upon this ground in granting summary judgment, "[t]his court can affirm summary judgment on any basis supported by the record, ignoring, if necessary an erroneous basis relied on by a district court." County of Oakland v. City of Berkley, 742 F.2d 289, 298 (6th Cir.1984); Herm v. Stafford, 663 F.2d 669, 684 (6th Cir.1981).[6]
 
 
 67
 Dr. Stone's claim for damages for the Sherman Act violation is based on section 4 of the Clayton Act, 15 U.S.C. Sec. 15, which allows treble damages to any person "who shall be injured in his business or property by anything forbidden in the antitrust laws." Liability must be established under section 4 in order for a Sherman Act violation to become redressable as a private civil wrong. McClure v. Undersea Industries, Inc., 671 F.2d 1287, 1289 (11th Cir.1982), cert. denied, 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983). A successful Clayton Act plaintiff must show economic injury to its business or property caused by the alleged antitrust conspiracy. Stearns v. Genrad, Inc., 752 F.2d 942, 945 (4th Cir.1984); Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 723-24 (11th Cir.1984). See also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc. 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Cf. Chrysler Corp. v. Fedders Corp., 643 F.2d 1229 (6th Cir.1981) (plaintiffs must allege antitrust injury to establish standing).
 
 
 68
 The determination of antitrust injury can be properly made on a motion for summary judgment. See, e.g., Midwestern Waffles, Inc., 734 F.2d at 723-24. The record does not indicate a "genuine issue of material fact" on this particular issue. The plaintiff submitted the deposition testimony of expert witness Dr. Paul Feldstein in its brief in opposition to summary judgment. Dr. Feldstein attempted to show that Beaumont Hospital serves a distinct market of cardiology patients. Analysis of the relevant market area is, of course, a complex process, Borden, Inc. v. FTC, 674 F.2d 498 (6th Cir.1982), and one which I believe is not necessary in this instance. Rather than a complicated determination of the existence of a monopoly, the initial question, it seems to me, should be the establishment of the existence of some economic injury to "business or property" as required by 15 U.S.C. Sec. 15. Without such a showing, further analysis is unnecessary. See Midwestern Waffles, Inc., 734 F.2d at 722-23.
 
 
 69
 The record in this case is devoid of any evidence of antitrust injury. Dr. Stone has a thriving cardiology practice at Harper Hospital, where he directs the catheterization lab, and where he has access to an emergency room through Detroit Receiving Hospital and to an open heart surgery program. Dr. Stone is still able to compete for patients currently using Beaumont Hospital by convincing them to undergo treatment at one of the several hospitals where he has staff privileges. Cf. Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. at 26-28, 104 S.Ct. at 1566-67. Moreover, the antitrust violation, if there was any, was a conspiracy to keep any physician who wanted to be full-time geographic at Beaumont Hospital from competing with Gordon-Timmis Associates. Dr. Stone did not want to be full-time geographic. As the majority states, he only wanted to use Beaumont's facilities two or three times a month. Thus, the putative antitrust violation in this case could in no way have caused his alleged injury.
 
 
 70
 Although Dr. Stone has failed to show injury for purposes of section 4 of the Clayton Act, he also seeks injunctive relief under section 16 of that Act, 15 U.S.C. Sec. 26. The standard for proving injury under section 16 is not as stringent as section 4, but Dr. Stone must still demonstrate a "significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Bender v. Southland Corp., 749 F.2d 1205, 1214 (6th Cir.1984) (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969)). See also Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 395 (6th Cir.1975). Again, Dr. Stone has presented no probative evidence that he faces a "significant threat of injury." Dr. Stone is in no danger of losing his practice at Harper Hospital. In fact, he has a contract with Harper that requires him to practice there. And as Dr. Stone himself admits, he only intends to use Beaumont catheterization facilities two or three times a month. The possible injury from not being allowed such a limited use of the facilities is de minimis.
 
 III.
 
 71
 I fully realize that my stance is not in accord with the weight of judicial authority on this issue. I comment now in a separate concurrence because automatic dismissal of these increasingly frequent cases could preclude litigation of meritorious claims in the future, and because I feel this theory is at least worthy of consideration as one approach to a difficult problem.
 
 
 
 *
 Hon. John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 Cardiology involves the diagnosis and treatment of persons with heart disease. In this area, physicians employ procedures that are termed "invasive" or "non-invasive," depending on whether an actual invasion of the patient's body is required. For example, an electrocardiogram (EKG) is a non-invasive diagnostic procedure, while a heart catheterization, involving insertion of a catheter into the body to examine the heart, is classified as an invasive technique
 
 
 [2]
 As explained by defendants, "full-time geographic" is a term used to describe a physician's ability to devote the majority of his time to one hospital in order to provide an around-the-clock team of qualified back-up physicians
 
 
 [3]
 Defendants filed an untimely notice of appeal wherein they challenged the lower court's ruling as to jurisdiction. Plaintiffs responded with a motion to dismiss defendants' appeal as untimely. The motion has been referred to this panel. Although plaintiff's motion is technically correct, dismissal of defendants' appeal as untimely becomes an exercise in futility because the issue of subject matter jurisdiction is threshold to the court's authority to invoke its jurisdiction to proceed with an action. Subject matter jurisdiction may be contested at any and all stages of the proceedings, even after judgment and may be addressed by the court sua sponte
 
 
 [4]
 The Furlong court's interpretation of McLain as requiring plaintiff to allege sufficient facts that the defendants' purported illegal activity itself have a "not insubstantial effect on interstate commerce" (as opposed to focusing, as did the court below, upon the defendants' business in general to find the interstate nexus) was cited approvingly by this circuit in McElhinney v. The Medical Protective Co., et al., 738 F.2d 439 (6th Cir.1984). However, that decision, which reversed the trial court's conclusion that defendants' general interstate transactions satisfied the criteria, was not published, and therefore is not precedent within this circuit. See Sixth Circuit Rule 24(B); U.S. v. Eckman, 581 F.2d 587, 588 (6th Cir.1978) (per curiam) (unreported decision only binding if res judicata to present appeal)
 
 
 [5]
 Judge Martin's concurrence would affirm the trial court's motion for summary judgment on the theory that no antitrust injury was proved. Initially, I seriously question this court's inherent authority to affirm the district court's award of summary judgment on issues that were not addressed by the district court nor assigned as error, briefed or argued before this court. To support its conclusion, the concurrence cites to County of Oakland v. City of Berkley, 742 F.2d 289, 298 (6th Cir.1984) and Herm v. Stafford, 663 F.2d 669, 684 (6th Cir.1981). The controlling language of Herm is as follows:
 [a]n appellate court can find an alternative basis for concluding that a party is entitled to summary judgment ... provided it proceeds carefully so the opposing party is not denied an opportunity to respond to the new theory.
 In the instant case the concurrence contends that the plaintiff was not denied an opportunity to respond to the injury theory because that issue had been raised in the trial court. However, a review of the record in this appellate proceeding fails to disclose that the defendants joined the issue of no injury as an assignment of error or that the plaintiff responded or had an opportunity to respond to the argument before this court. An examination of the record before the trial court concerning the motion for summary judgment reflects that the issue of antitrust injury and damage was properly joined by the pleadings and by the defendants' affirmative assertions which were specifically denied by the plaintiffs. Moreover, the plaintiff supported his allegations with documentary evidence including the deposition testimony of his expert witness Dr. Paul Feldstein. J.App. 331. Although only one page of Dr. Feldstein's testimony is incorporated into the record, the following synopsis of that testimony outlined in the plaintiff's brief in opposition to the motion for summary judgment states:
 (b) Patient Market
 After two hearings before this Court, plaintiff obtained patient origin zip code data showing the residence of patients who were treated for cardiological problems at 18 Detroit area hospitals having catheterization facilities. Plaintiff's expert, Dr. Paul Feldstein, Ph.D., was questioned about this data during his recent deposition. Dr. Feldstein testified that there is an area consisting of approximately 15 zip codes from which most of the patients utilize Beaumont Hospital for cardiologic difficulties. In Dr. Feldstein's opinion, Dr. Stone cannot hope to treat patients residing in this market area unless he obtains staff privileges at Beaumont Hospital (Feldstein Tr. 1:24). Plaintiff intends to utilize this data at trial to establish, through expert testimony, that there is a distinct market of cardiology patients served by Beaumont Hospital and Drs. Gordon and Timmis. In addition, plaintiff will produce data showing that although Beaumont and Harper Hospitals are relatively equal in size, in 1980 the volume of cardiac diagnoses at Beaumont was nearly twice that at Harper.
 Because defendants have not seen plaintiff's statistical data, they certainly cannot assert to this Court that the data is incorrect or that the conclusions drawn by plaintiff's expert are erroneous. In any event, definition of market based on the submissions of the respective parties must await trial, inasmuch as it presents a factual issue to be resolved. (See, e.g., FTC v. Rhinechem Corp., 459 F.Supp. 785, 788 (N.D.Ill., 1978) ("The definition of a relevant product market is a factual question").*
 Instead, defendants hope to skirt the issue by stating merely that Crittenton Hospital serves the same type of patients as are treated at Beaumont Hospital. However, this is not the same thing as saying that Crittenton Hospital services the same patient population. In point of fact, plaintiff's patient origin zip code data establishes conclusively that Beaumont Hospital and Crittenton Hospital service separate and distinct markets of cardiac patients.
 
 
 *
 See also Borden, Inc. v. FTC, 674 F.2d 498 (6th Cir.1982), wherein the Sixth Circuit Court of Appeals stated that "Only a careful factual analysis of the market in question will reveal whether monopoly power, in fact, exists." Id. 510.
 
 
 J
 App. 123-124
 The conflicts of fact as to the material issue of antitrust injury and damage are demonstrated by the foregoing summary of the plaintiff's challenge to the defendants' assertions on the issue. Essentially, plaintiff claimed damages for being denied access to a separate and distinct market of cardiac patients served by Beaumont. It is apparent that where, as here, the record reveals the existence of material issues of fact bearing on the presence or absence of an antitrust injury, summary judgment is inappropriate. The concurrence would not only invade a province of the jury, but endorse the highly disfavored practice of weighing the limited evidence in the record, assessing its probative value, passing upon credibility, speculating as to ultimate findings and electing between the factual inferences which could be drawn from the evidence adduced pursuant to a summary judgment motion. See Aronsen v. Crown Zellerbach, 662 F.2d 584 (9th Cir.1981), cert. denied, 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 431 (1983) and Kennett-Murray Corp. v. Bone, 622 F.2d 887 (5th Cir.1980).
 
 
 [1]
 As the Court said in McLain v. Real Estate Board of New Orleans, Inc., 444 U.S. 232, 243, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980):
 Even where there is an inability to prove that concerted activity has resulted in legally cognizable damages, jurisdiction need not be impaired, though such a failure may confine the available remedies to injunctive relief. See Georgia v. Pennsylvania R. Co., 324 U.S. 439, 452-463, 65 S.Ct. 716, 723-28, 89 L.Ed. 1051 (1945); Keogh v. Chicago & N.W. R. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922).
 
 
 [2]
 The Supreme Court has noted in United States v. SCRAP, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973):
 We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, see Baker v. Carr, 369 U.S. 186 [82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ]; a $5 fine and costs, see McGowan v. Maryland, 366 U.S. 420 [81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) ]; and a $1.50 poll tax. Harper v. Virginia Bd. of Elections, 383 U.S. 663 [86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) ].... As Professor Davis has put it: "The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." Davis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601, 613. See also K. Davis, Administrative Law Treatise Secs. 22.09-5, 22.09-6 (Supp.1970).
 
 
 [3]
 Judge Martin's proposed reading of McLain "would in essence eliminate the interstate commerce test from antitrust law, since the total activities of virtually any defendant, no matter how local its business, are likely to have some effects upon interstate commerce." Kissan, Webber, Bigus & Holzgraefe, Antitrust and Hospital Privileges: Testing the Conventional Wisdom, 70 Calif.L.Rev. 595, 632 (May, 1982)
 
 
 [4]
 Twelve other cardiologists, none of whom is affiliated with GTA, have privileges at Beaumont and of these twelve, nine have catheterization lab privileges
 
 
 [5]
 Privilege decisions that affect only individual practitioners or local communities of practitioners raise the most difficult cases for the interstate commerce test, and these cases invite different results under different approaches. The current case law appears to be more or less split on this matter, apparently depending upon the presence or absence of some special quantitative contact with interstate commerce. Kissan, Webber, Bigus & Holzgraefe, Antitrust & Hospital Privileges: Testing the Conventional Wisdom, 70 Calif.L.Rev. 595, 637 (May, 1982)
 
 
 [1]
 For a thorough discussion of the application of the interstate commerce requirement to hospital staff exclusion cases, see Note, Sherman Act "Jurisdiction" in Hospital Staff Exclusion Cases, 132 U.Pa.L.Rev. 121 (1983); see generally P. Areeda & D. Turner, Antitrust Law, p 232.1 (Supp.1982)
 
 
 [2]
 The argument that a failure to allege an effect on interstate commerce is a failure to state a claim rather than a failure to allege subject matter jurisdiction is a persuasive one. See, e.g., P. Areeda & D. Turner, Antitrust Law, p 232.1 at 97-99 (Supp.1982); Note, Sherman Act "Jurisdiction" in Hospital Staff Exclusion Cases, 132 U.Pa.L.Rev. 121 (1983). This distinction is irrelevant in the instant case, however, as I believe the plaintiff has established a sufficient nexus with interstate commerce
 
 
 [3]
 Several courts have relied on the following language that appears near the end of the McLain opinion to support their conclusion:
 To establish federal jurisdiction in this case, there remains only the requirement that respondents' activities which allegedly have been infected by a price-fixing conspiracy be shown "as a matter of practical economics" to have a not insubstantial effect on the interstate commerce involved.
 McLain, 444 U.S. at 246, 100 S.Ct. at 511. Courts that have adopted a narrow view of McLain have interpreted this passage to require a showing that the "infected" activities of the defendant or, in other words, defendant's alleged antitrust violations have the requisite effect on interstate commerce. See Seglin, 769 F.2d at 1280; Furlong, 710 F.2d at 926; Cordova & Simopietri Insurance Agency, Inc. v. Chase Manhattan Bank, 649 F.2d at 45. In my opinion, this is a slim reed to rely upon to reject the indisputably explicit language in the McLain opinion rejecting this proposition. As I read this passage, it was not intended to have any limiting effect on the explicit language in the earlier portion of the opinion. The court was simply stating that the brokers' activities had allegedly been infected by an antitrust conspiracy.
 
 
 [4]
 I believe a recent decision of the Supreme Court also lends support to my position. In a hospital staff privilege case, the Court did not even discuss the interstate commerce requirement but simply turned to the merits of the case. Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Because the requirement is jurisdictional, as the majority recognizes, the Court implicitly acknowledged its satisfaction. In fact, four members of the Court who concurred in the judgment stated, "It is not disputed that such an impact [on interstate commerce] is present here." Id., 104 S.Ct. at 1569, 1571 n. 5
 
 
 [5]
 The Eleventh Circuit very recently held that "Sherman Act jurisidiction requires a focus on the interstate markets involved in the defendant's business activities." Shahawy v. Harrison, 778 F.2d 636, 640 (11th Cir.1985) [citations omitted]. However, on facts essentially identical to those before the court here, the Shahawy court concluded that the respondents were sufficiently involved in interstate commerce to establish jurisdiction under the Sherman Act. Id. at 641
 
 
 [6]
 In this case, counsel for the defendants raised the issue of no injury in his motion for summary judgment. Counsel for the plaintiff had an opportunity to respond and did respond to the argument at the hearing on the summary judgment motion